MICHAEL A. MILES, administrator, & another[1]  *vs.*
EDWARD O. TABOR, M.D., INC.[2]

Middlesex.  September 16, 1982. — December 28, 1982.

Present: WILKINS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Negligence,* Doctor, Emotional distress.  *Medical Malpractice,* Causation.
  *Evidence,* Death certificate.  *Emotional distress.*

The jury at the trial of a wrongful death action were not required to accept
  a cause of death listed on a death certificate where there was other evi-
  dence at the trial contradicting the death certificate. [785-787]
A mother was not entitled to recover for the negligent infliction of emo-
  tional distress by a doctor whose negligence at her son's birth resulted
  in the boy's death about two months later, where all the evidence of
  emotional distress experienced by the mother related to the period
  after her son's death rather than to the time of the defendant's
  negligence. [787-789]

CIVIL ACTION commenced in the Superior Court Depart-
ment on December 29, 1978.

The case was tried before *Morse,* J.

The Supreme Judicial Court granted a request for direct
appellate review.

*William H. Shaughnessy (Mary Jane Morgen* with him)
for the plaintiffs.

*Charles P. Reidy, III,* for the defendant.

ABRAMS, J.  Damon O. Miles, age two months, died on
October 26, 1977.  On December 29, 1978, Damon's father
commenced an action against the defendant for the wrong-

---

[1] Michael A. Miles is acting here as administrator of the estate of
Damon O. Miles, his son.  The other plaintiff is Lynne A. Miles, wife of
Michael A. Miles, and mother of Damon O. Miles.

[2] Other defendants in the Superior Court are not before us on this ap-
peal.

ful death of his son. G. L. c. 229, § 2. In an amended complaint, Damon's mother sought damages from the defendant for negligent infliction of emotional distress. The jury returned verdicts for the plaintiffs on these claims. After trial, the defendant filed a motion for judgment notwithstanding the verdicts on each claim. See Mass. R. Civ. P. 50 (b), 365 Mass. 814 (1974). The judge denied the defendant's motion for judgment notwithstanding the verdict on the claim for wrongful death, but he allowed the motion on the claim for negligent infliction of emotional distress. The parties filed cross appeals. We granted the plaintiffs' application for direct appellate review and affirm the judgments of the Superior Court.

We summarize the facts.[3] Lynne Miles became pregnant some time between November, 1976, and February, 1977. Miles selected Dr. Tabor as her obstetrician. He estimated the delivery date to be late October.

On August 21, 1977, Dr. Tabor admitted Miles to a hospital in Lowell because she was bleeding. She was discharged three days later without giving birth. Dr. Tabor informed Miles that she was "only seven months along." On August 27, 1977, Miles was again admitted to the hospital and, despite Dr. Tabor's continued assertion that she was only in her seventh month, she delivered a full-term baby the next morning.[4] At some time before the child's birth, but certainly by 7 or 7:10 A.M., the baby's heart rate dropped from 132 beats a minute to 72 beats a minute. Damon was delivered at 7:38 A.M. on August 28.

Miles saw Damon after he was born. His body was a gray-blue color. Miles watched Dr. Tabor hand Damon to a nurse and instruct her to "snap" the baby's feet and to give it oxygen. The mother saw Dr. Tabor listen to the baby's heartbeat with a stethoscope and then walk away. He said to Miles, "It doesn't look good, I can't hear a heart beat."

---

[3] Additional evidence will be set forth in our review of the substantive claims.

[4] In this appeal, there is no claim by Miles of Dr. Tabor's negligent treatment of her.

Dr. Tabor then stayed on the opposite side of the delivery room from the baby for about ten minutes.[5]

Damon was eventually diagnosed as suffering from brain damage and asphyxia. Several experts, articles from medical journals, and the standards of the American College of Obstetricians and Gynecologists indicated that the obstetrician is responsible for resuscitation, and that Dr. Tabor's efforts for Damon were not in accordance with proper medical standards.

Some time later, Damon was transferred to Children's Hospital in Boston, under the care of other physicians, where he remained for almost a month. During that time, a gastrostomy was performed to facilitate his eating, which was impaired because of his breathing problems. The baby died at home in his sleep on October 26, 1977, about two months after his birth.

After Damon's death, Miles suffered a severe depression. Her husband testified that she "lost a considerable amount of weight," "very seldom had a full meal," and that there was "a drastic change in her behavior compared to what she used to be." She cried a lot, ceased to care for her appearance, was not sleeping properly, and was extremely depressed. Dr. Bernard Yudowitz, a psychiatrist who examined Miles for the purposes of the litigation, testified that she was suffering "a severe and chronic depression," a trauma that "can never really disappear." He noted that her severe depression "led to the physical manifestations . . . of weight loss, restlessness, sleeplessness, loss of sexual interest, and so forth." Although Miles showed no physical manifestations of her depression until Damon died, Dr. Yudowitz estimated that the onset of her severe depression dated from her observations of Dr. Tabor's actions in the delivery room.

1. *Issue of causation.* "In reviewing the denial of [Dr. Tabor's] motion for judgment notwithstanding the verdict

---

[5] These observations are the basis of Miles's claim for damages from negligent infliction of emotional distress.

[on the claim for wrongful death], the same standard applies as would apply to a review of a motion for a directed verdict, . . . namely, whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff.' *Poirier* v. *Plymouth*, 374 Mass. 206, 212 (1978), quoting from *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972)." *Abraham* v. *Woburn*, 383 Mass. 724, 727-728 (1981).

Dr. Tabor concedes that there was sufficient evidence before the jury to allow them to find that he did not act in accordance with proper medical standards,[6] but he argues that there was insufficient evidence of causation. He claims that, even if there were evidence that his negligence was causally related to one cause of death listed on the death certificate, namely aspiration pneumonia, there was no evidence linking him to the second cause of death on the death certificate, namely a congenital malformation of the G.I. [gastro-intestinal] tract. The defendant reasons that there was no way for the jury to find that aspiration pneumonia, rather than the G.I. tract malformation, was the cause of death.

The flaw in the defendant's argument is that he views the death certificate as definitive on the issue of causation. However, a death certificate, like a birth certificate, is not conclusive, but is only "prima facie evidence of the facts recorded." G. L. c. 46, § 19, as amended through St. 1976, c. 486, § 13. "*Prima facie* evidence means evidence which not only remains evidence throughout the trial but also has up to a certain point an artificial legal force which compels the conclusion [by the jury] that the evidence is true," *Cook* v. *Farm Serv. Stores*, 301 Mass. 564, 566 (1938), until it is rebutted. Once evidence is introduced contradicting the prima facie evidence, the prima facie evidence need be given "only the weight that . . . [it] deserve[s] in the estimation of the jury." *Id.* at 569. See *Commonwealth* v.

---

[6] This concession was made at oral argument.

*Pauley,* 368 Mass. 286, 290 (1975); P.J. Liacos, Massachusetts Evidence 49-61 (5th ed. 1981).

In this case, there was ample evidence contradicting the death certificate. At trial, the physicians who examined Damon shortly after his birth concluded that congenital malformation of the G.I. tract was not a cause of death. No charts or hospital records indicated that Damon had a congenital malformation of the G.I. tract. Additionally, the birth certificate completed by Dr. Tabor indicated that Damon did not have any congenital malformations. Resolution of the conflict between the death certificate and the birth certificate raised a factual issue on causation for the jury. The jury could, therefore, disregard the statement on the death certificate that the malformation of the G.I. tract was a cause of death.

Once the death certificate is recognized as inconclusive on the issue of causation, Dr. Tabor's entire challenge to the ruling on his motion for judgment notwithstanding the verdict fails. Expert testimony linked Dr. Tabor's inadequate resuscitative techniques to Damon's condition and subsequent death. The expert opinions at least showed "a probability of causal relation rather than a mere possibility of such relation." *Berardi* v. *Menicks,* 340 Mass. 396, 402 (1960). See *Haggerty* v. *McCarthy,* 344 Mass. 136, 140-141 (1962). The "plaintiff was not required to show the exact cause of [the] injuries or to exclude all possibility that they resulted without fault on the part of the defendant. It was enough if [he] showed that the harm which befell [his son] was more likely due to negligence of the defendant than to some other cause for which he was not liable." *Woronka* v. *Sewall,* 320 Mass. 362, 365 (1946). *Samii* v. *Baystate Medical Center,* 8 Mass. App. Ct. 911, 912 (1979). Since sufficient evidence of causation was before the jury, we affirm the judge's denial of the motion for a judgment notwithstanding the verdict on the claim for wrongful death.

2. *Negligent infliction of emotional distress.* Miles claims damages for the emotional distress she suffered due to Damon's injuries and death. Although the jury found in

her favor, the judge entered a judgment notwithstanding the verdict for the defendant. See *Smith* v. *Ariens Co.,* 375 Mass. 620, 627-628 (1978). The judge based his conclusion on the lack of evidence of "substantial physical injury" suffered by the mother in response to her emotional distress over Damon's injuries. The judge determined that Miles's distress was otherwise reasonably foreseeable, and that it was for the jury to determine the credibility of the psychiatrist's evidence that Miles's trauma began in the delivery room.

We need not pass on the correctness of the judge's ruling on the motion for judgment notwithstanding the verdict, because we reach the same result, but for different reasons. We conclude that there is insufficient evidence of emotional distress experienced by Miles at the time of the doctor's negligence in the delivery room to permit her to recover.

On this record, there is no evidence that Miles suffered any symptoms of emotional distress until after Damon died. Miles's husband said that after Damon's birth, "there was no negative attitude at all, [Lynne] was just happy that we had Damon home with us so she could care for him, and she was very alert and happy as far as she could be under the circumstances." He further stated that after Damon's death, "[t]here was a drastic change in her behavior compared to what she used to be, it was like night and day." Miles's relatives and friends corroborated the fact that Miles changed after Damon's death.

Miles told the jurors that her emotional and physical condition deteriorated after Damon's death. She grieved for the loss of her child and for the loss to the family circle. A wrongful death action is designed to compensate "for the loss of the reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice of the decedent to the persons entitled to the damages recovered." G. L. c. 229, § 2, as amended through St. 1981, c. 493, § 1. The damages awarded on a wrongful death claim are "a statutory trust fund, held by the administratrix as trustee for distribution

to the statutory beneficiaries [i.e., Damon's parents]." *Sullivan* v. *Goulette,* 344 Mass. 307, 311 (1962).

A plaintiff's emotional distress must follow "closely on the heels of" the negligent act. *Ferriter* v. *Daniel O'Connell's Sons,* 381 Mass. 507, 518 (1980). *Dziokonski* v. *Babineau,* 375 Mass. 555 (1978) (mother saw child in street immediately after a motor vehicle accident and died from shock).[7]

The psychiatrist called by the plaintiff said that in his opinion Miles's depression originated with her observations of Dr. Tabor's actions in the delivery room. However, his opinion mainly focused on the grief Miles suffered from the death of Damon. The psychiatrist did not dispute the fact that Miles experienced no symptoms of emotional distress until after Damon's death. He did not say that Miles's emotional distress "directly result[ed] from experiencing or witnessing the effects of [Dr. Tabor's] conduct" in the delivery room, *Cimino* v. *Milford Keg, Inc.,* 385 Mass. 323, 334 (1982), rather than from the death of Damon. Thus, there was insufficient evidence that Miles suffered emotional distress at Damon's birth which was distinct from the claim of wrongful death.[8] The judge did not err in granting the defendant's motion for judgment notwithstanding the verdict on the count for negligent infliction of emotional distress.

*Judgments affirmed.*

---

[7] In *Dziokonski* v. *Babineau, supra,* we left open the question whether the father could recover for his injuries due to negligent infliction of emotional distress, where there was a time lapse between the accident and the father's knowledge of the death of his wife and the injuries to his child, because the pleadings were incomplete.

[8] This case is unlike *Cimino* v. *Milford Keg, Inc.,* 385 Mass. 323, 334 (1982), in which we held that a claim for emotional distress was distinct from a wrongful death action. In that case, a father suffered emotional distress, as well as physical injury, in the same accident which caused the death of his son. The emotional distress, therefore, was a separate cause of action which arose at the time of the defendant's negligence. There was no delayed response to the child's death.

Furthermore, unlike the plaintiffs in *Payton* v. *Abbott Labs,* 386 Mass. 540 (1982), and the father in *Cimino* v. *Milford Keg, Inc., supra,* Miles herself suffered no direct injury from the defendant's negligent treatment of Damon.