DONALD MACCUISH, administrator, vs. VOLKSWAGENWERK
A. G. & another.[1]

Middlesex. January 17, 1986. — June 20, 1986.

Present: GREANEY, C.J., KAPLAN, & DREBEN, JJ.

*Warranty. Negligence,* Manufacturer of motor vehicle, Design, Contribu-
tory. *Motor Vehicle,* Defect. *Evidence,* Expert opinion, Regulation,
Safety standards, Relevancy and materiality. *Error,* Harmless. *Witness,*
Expert, Impeachment. *Judge. Damages,* Wrongful death, Interest. *Prac-
tice, Civil,* Instructions to jury, Objection. *Statute,* Construction. *In-
terest.*

In an action based on theories of negligence and breach of warranty seeking
recovery from the manufacturer of a van for the wrongful death of a
passenger in the vehicle who was ejected through a window when the
vehicle overturned after a collision, the evidence was sufficient to present
a question for the jury whether the window glass had dropped out before
the van reached the ground and whether this had occurred as the result
of defects in the window retention system. [383-385]
In an action seeking recovery from the manufacturer of a van for the
wrongful death of a passenger in the vehicle who was ejected through
a window when the vehicle overturned after a collision, the evidence
most favorable to the plaintiff would have warranted the jury in finding
that the van's seat mounting system was defective in that the clamps
securing the removable seat that the decedent was occupying at the time
of the collision exposed her to an unreasonable risk of injury. [385-386]
Where evidence in a wrongful death action against the manufacturer of a
van showed that, owing to the design of the clamps securing a removable
seat in a vehicle, it was reasonably foreseeable that the clamps would
be improperly replaced by the user and that an occupant of the seat
would be endangered thereby, the plaintiff was not required to show
that this defect was not caused by intermediate handlers of the vehicle.
[386]
Failure, if any, of a passenger in a van to be wearing a seat belt at the time
of a collision in which she was fatally injured did not preclude recovery

[1] Volkswagen of America, Inc.

by her administrator in a wrongful death action against the vehicle's manufacturer based on the theory of a breach of warranty. [386-387]

At the trial of an action seeking recovery from the manufacturer of a van for the wrongful death of a passenger in the vehicle who was ejected through a side window when the vehicle overturned after a collision, the judge did not err, on grounds of relevancy, in admitting in evidence a letter from the National Highway Traffic Safety Administration to the defendant and other manufacturers informing them of the agency's concern with the possibility that occupants might be ejected through van windshields, where evidence was introduced to the effect that the windshield and side windows of the van in question had similar design features and that gluing would be an effective retention device for both; nor, in the circumstances, could the characterization of the letter as a "defect notification" have been misleading to the jury. [387-388]

At the trial of an action seeking recovery from the manufacturer of a van for the wrongful death of a passenger in the vehicle who was ejected through a side window when the vehicle overturned after a collision, the judge did not err in admitting evidence of certain submissions by the defendant in response to a proposed Federal motor vehicle safety standard indicating that the defendant was aware that gluing would increase the retention capabilities of the van's windshield and therefore the van's side windows, which were similar in design. [388-389]

At the trial of a wrongful death action against the manufacturer of a van, the admission of evidence of a Federal safety standard applicable to buses, although error, did not require reversal of a judgment for the plaintiff, where other evidence made clear that the van did not fall within the definition of a bus. [389-391]

At the trial of a civil action the judge acted within his discretion in refusing to allow the plaintiff's expert witness to be impeached by use of his deposition testimony, where the judge could properly conclude that there was no relevant inconsistency between the witness's trial testimony and his deposition testimony. [391]

There was no merit to a claim that the judge presiding at the trial of a civil action was biased. [391-392]

Although, at the trial of future wrongful death actions, a simple instruction calling for the exclusion from consideration on the issue of damages of the survivors' grief, anguish and bereavement would be appropriate, the judge presiding at the trial of such a case did not err in instructing the jury in the language of the wrongful death statute, G. L. c. 229, § 2, where the defendants' objection to the instruction did not sufficiently apprise the judge of the specific ground relied upon, where the defendants' proposed alternative instruction was incorrect, and where the defendants had not objected to the testimony on the issue. [392-398]

In an action against a motor vehicle manufacturer to recover for the wrongful death of a fifteen year old girl, the judge did not abuse his discretion in permitting the jury's award of $3,000,000 to stand. [398-399]

Prejudgment interest awarded under G. L. c. 229, § 11, to the plaintiff in a civil action should have been computed at the rate of six percent per annum, not twelve percent. [399-400]

Under a stipulation for the settlement of certain claims in a civil action, the amount paid in settlement should have been deducted from the jury's award before prejudgment interest was computed. [400]

CIVIL ACTION commenced in the Superior Court Department on May 19, 1980.

The case was tried before *James L. Vallely,* J.

*Jerome M. Leonard (Lane McGovern, James L. Sigel, & Elizabeth Paine* with him) for the defendants.

*Michael J. Flynn (Thomas Hoffman* with him) for the plaintiff.

DREBEN, J. On March 17, 1980, fifteen year old Karen MacCuish, a passenger in a Volkswagen van, died of a fractured skull. Her father, as administrator of her estate, brought a wrongful death action (G. L. c. 229, § 2) against the defendant Volkswagen companies. A jury awarded the plaintiff $3,000,000 on theories of negligence and breach of warranty. In answer to special questions, the jury did not find gross negligence or wilful or reckless conduct on the part of the defendants and, accordingly, denied the plaintiff punitive damages under G. L. c. 229, § 2. The defendants raise numerous questions in this appeal. Except for the rate governing prejudgment interest and the method of reducing the verdict because of a prior settlement, we affirm the judgment.

The van (a 1975 "microbus"), after a collision with a 1975 Toyota Celica, ended up on a sidewalk on its left side. Karen was found lying on her back with her head partially outside the van's middle side window.

The experts offered different explanations as to how the van reached its ultimate landing place. The defendants' experts claimed a violent "slamdown"; the plaintiff's, that the van took a lazy roll after tipping when its rear wheel climbed a lawn berm. A crucial and bitterly contested question was whether the middle window of the van remained in place and only shattered when the side of the van hit the ground, or whether

the window had fallen out earlier. It was undisputed that the fatality rate in automobile accidents is far higher when a person is ejected from a vehicle[2] and, for this reason, both sides laid great stress on whether Karen's head came out of the window prior to impact.

The plaintiff presented two main design defects leading to Karen's injuries — the van's window retention system and its seat mounting system. As to each, the defendants argue that the plaintiff's theory was speculative and lacked a reasonable factual basis, see *Nass* v. *Duxbury,* 327 Mass. 396, 402 (1951), and that their motions for a directed verdict and for judgment notwithstanding the verdict should have been allowed. Applying the proper standard, that is, construing the evidence most favorably to the plaintiff but recognizing that the inferences must be based on probabilities not possibilities, *Ferragamo* v. *Massachusetts Bay Trans. Authy.,* 395 Mass. 581, 591 (1985), we think the evidence was sufficient to present a jury question. There were here enough facts on which the experts could base their opinions. See *Carey* v. *General Motors Corp.,* 377 Mass. 736, 742 (1979). We summarize what the jury could have found.

1. *Evidence as to window retention system.* The plaintiff claimed that because of a defective design the side window dropped out before the van reached the ground, and, as a result, Karen's head fell through the opening and was pinned by the roof rail of the vehicle.

There was a factual basis for the theory of gentle roll-over and dropped window. Several of the van's occupants testified that the van had stopped before entering the intersection where the accident occurred and that its speed was no more than five to fifteen miles an hour at the time of the collision. The damage to the two vehicles was not extensive and was consistent with a collision of moderate force. Two of the rear passengers found themselves after the roll-over standing, unhurt and holding

---

[2] There was evidence that the chance of being killed increases forty-fold when a person is ejected from a car. Karen was the only occupant a portion of whose body had been ejected from the van and was the only one of the six occupants with serious injuries.

onto straps. They were able to walk away. The left front tire and hub cap on which the van had pivoted showed no damage or denting. The location and angles of two pools of glass squares found beneath the van indicated that the side windows had dropped out before the van hit the ground. There was no glass lying under Karen's head or body, and no fragments were found in the laceration on her head. No dicing[3] marks were found on her face.

The inadequacy of the window retention system was evident to the plaintiff's experts. The rubber weatherstripping (grommet) circling the window was minimal in size and termed "grossly" substandard when compared to that of domestic cars. The width of the metal flange which held the grommet in place was narrower, and the amount of glass that penetrated into, and was held by, the grommet was less than in domestic vehicles. There were other design features of the window said to be defective, for example, bridging.[4] Tests showed that the Volkswagen windows came out more easily than those of domestic companies.

Volkswagen knew of these weaknesses at the time of the accident. It had then lost and was appealing a lawsuit brought by other plaintiffs involving the window retention system. The company, itself, had developed several patents with feasible alternative designs.

The simple device of gluing would have improved retention. In the opinion of Dr. Robert Brenner, who was one of the plaintiff's experts and had served formerly as chief scientist of the National Highway Traffic Safety Administration, gluing would have remedied the defect, and Karen, the only person ejected from the van, "would have had the same outcome as the other occupants of the vehicle."

---

[3] The side window was made of tempered glass and constructed so that if shattered it would break into small squares which, if leaned against, would cause "dicing" marks.

[4] Bridging was explained as an incomplete grasping of the metal flange by the grommet.

Since there were readily available design modifications known to the defendants which would have reduced the risk of window "popout" without "undue cost or interference with the performance of the [van]," there was a case for the jury both in negligence and breach of warranty. *Uloth* v. *City Tank Corp.,* 376 Mass. 874, 881 (1978). *Fahey* v. *Rockwell Graphic Syss.,* 20 Mass. App. Ct. 642, 649, 651 (1985). The plaintiff has met his burden of showing that "there was greater likelihood or probability that the harm complained of was due to causes for which the defendant[s were] responsible than from any other cause." *Carey* v. *General Motors Corp.,* 377 Mass. at 740. Compare *Swartz* v. *General Motors Corp.,* 375 Mass. 628, 633 (1978). As in *Carey, supra* at 742, the "analytical arguments of [Volkswagen] emphasizing what it views as omissions and inconsistencies in the facts relied on by the expert witness[es], go to the weight of the evidence, some of it conflicting. Thus they more appropriately should be [and were] addressed to the jury."

2. *Evidence as to the seat mounting system.* Taking the evidence most favorable to the plaintiff, the jury could also have found that the design of the seat mounting system was defective, permitting the middle bench seat to break loose. Had the seat remained in place, Karen, like the other rear passengers, would have had something to hold onto, i.e., the armrest, and would not have had as much space within which to move. According to the plaintiff's experts, both factors increased the probability of ejection.

The seat on which Karen was sitting was removable so that the van could carry cargo. The mounting system consisted of six open clamps which held three u-shaped cylindrical rails functioning as the legs of the seat. The clamps were fastened with removable bolts which fitted into keyhole-shaped slots in plates welded to the floor. The plaintiff's experts pointed out that the simple device of a closed (horse-shoe) clamp encircling the rail would have provided far more protection.[5] See *Uloth*

---

[5] There was also evidence (disputed by the defendants' experts) that the design of the clamps permitted all of the clamps to face in the same direction

v. *City Tank Corp.*, 376 Mass. at 881. The jury, even without expert testimony, could have determined by examining the clamp that the design exposed the passengers to an unreasonable risk of injury.

3. *Intermediate handlers.* The defendants point out that the van was a multipurpose vehicle and that the middle bench seat was designed to be removed. Given the long period and extensive use of the van after it left the defendants' hands, they claim the plaintiff must show that the defect in the seat was not caused by intermediate handlers. See *Corsetti* v. *Stone Co.*, 396 Mass. 1, 24 (1985). The complaint here, however, is that the design of the mounting system was improper. Even if we accept the view that the open clamps, if properly placed, would have been reasonably effective, Volkswagen, as designer of the system, is required to "anticipate the environment in which its product will be used, and it must design against the reasonably foreseeable risks attending the product's use in that setting." *Back* v. *Wickes Corp.*, 375 Mass. 633, 640-641 (1978). *Bernier* v. *Boston Edison Co.*, 380 Mass. 372, 378 (1980). It was foreseeable that the seats would be removed and that the open clamps, because of their design, would be improperly replaced. See *Fahey* v. *Rockwell Graphic Syss.*, 20 Mass. App. Ct. at 648. "No negating of the possibility of mishandling by intermediates is [in such circumstances] necessary." *Smith* v. *Ariens Co.*, 375 Mass. 620, 626 (1978). See *Richard* v. *American Manuf. Co.*, 21 Mass. App. Ct. 967 (1986). See also *Nesselrode* v. *Executive Beechcraft, Inc.*, 707 S.W.2d 371, 381-382 (Mo. 1986).

4. *Seat belt defense.* The judge instructed the jury that Karen's failure, if any, to wear a seat belt was not an issue in the case. There was no error. Karen's negligence would not be a defense to a breach of warranty. *Correia* v. *Firestone Tire & Rubber Co.*, 388 Mass. 342, 355 (1983). Failure to wear a seat belt is not misuse of the product (a defense to breach

---

(giving even less grip). The instruction manual gave no warnings or instructions as to the direction of the clamps. The bolts holding the clamps could be fastened without fitting securely in the keyholes and could come out.

of warranty) unless Karen unreasonably proceeded to use a product "which [she knew] to be defective and dangerous." *Id.* at 355. There was no such evidence. Cf. *Breault* v. *Ford Motor Co.*, 364 Mass. 352, 354 (1973) (assumption of the risk defense not available on grounds of failure to wear seat belt since plaintiff did not know of risk). The jury found for the plaintiff on both negligence and breach of warranty theories. Since the seat belt defense is not available against the warranty theory, we need not decide whether the defense may be asserted against the negligence claim.[6]

5. *Evidentiary matters.* The defendants claim that three irrelevant and prejudicial items bearing on safety were improperly admitted in evidence.

(a) The first was a letter from the National Highway Traffic Safety Administration to the defendants and other van manufacturers informing them that the agency was concerned with the problem of occupant ejection through windshields. The objection of the defendants on appeal is two-fold:[7] one, that the letter (and subsequent correspondence) is not relevant as it concerns windshields rather than side windows; and two, that the letter was improperly represented as a defect notification. A "defect notification" is, according to the defendants, a technical term meaning a notification requiring recall.

There was evidence at trial that windshields and side windows have similar safety and design features,[8] and that gluing

---

[6] Evidence that the seat broke loose may have rendered the seat belt defense factually irrelevant even to the negligence claim. There was no evidence to suggest that the seat would not have broken loose if Karen had worn the belt. The "materiality of [Karen's] failure to wear a seat belt was particularly unclear." *Breault* v. *Ford Motor Co., supra* at 358.

[7] In their reply brief, the defendants also argue that the letter was hearsay, citing *Rice* v. *James Hanrahan & Sons*, 20 Mass. App. Ct. 701, 706 (1985). Since that issue was not argued to the trial judge, it is not before us.

[8] One of the plaintiff's experts, a former design engineer at Ford Motor Company, explained that a diagram in evidence comparing cross sections of grommets of various manufacturers showed that the Volkswagen section "is practically the same size on the windshield as it is on the side window with the same basic design." There was also other evidence to this effect.

would be an effective retention device for both.[9] For this reason, the judge in his discretion could determine that the letter was relevant. Volkswagen knew of the ejection danger in the van's windshield, that side windows had a similar design, and that the agency concerned with vehicular safety had recommended gluing. From this evidence, it could be inferred that Volkswagen knew, or should have known, that the retention problem also related to side windows and that gluing would be helpful in solving the difficulty.

While not a defect notification in the sense of requiring a recall, the letter could reasonably be taken as concerning a defect. Dr. Brenner (the plaintiff's expert) explained that the letter was a part of investigatory proceedings and was not an official defect notification requiring recall. In addition, counsel for the defendants, in closing argument, pointed out to the jury that the letter was not a notification requiring recall. Although the judge could, and perhaps should, have pointed out the difference to the jury, we do not think the jury were misled.

(b) The defendants also claim that certain submissions of Volkswagen in response to then proposed Federal Motor Vehicle Safety Standard 212, see 49 C.F.R. § 571.212 (1980), should not have been admitted. That standard also applies only to windshields and not to side windows. In addition, the van, because of its frontal design, was expressly exempt from complying with the standard even as to windshields.[10]

The earlier responses of Volkswagen to proposed Safety Standard 212, offered in evidence in the course of Dr. Brenner's testimony, indicated that Volkswagen had recognized that gluing increased the retention capabilities of windshields, at least

---

[9] Dr. Brenner testified that gluing was one of the safety measures available both for windshields and side windows.

[10] There was some evidence that the reason frontal design vehicles including the van were exempt from Standard 212 was that the test used to determine whether a vehicle met the standard would have shattered the windshield. Thus the windshield, if not for the inability to test it, would have been subject to the standard. On this basis, the court in *Seese* v. *Volkswagenwerk A.G.*, 648 F.2d 833, 846 (3d Cir.), cert. denied, 454 U.S. 867 (1981), ruled that Standard 212 could properly be admitted. See note 12, *infra*.

at certain impact velocities. Because there was evidence, see note 9, *supra,* that gluing would act as a glass retention enhancer for side windows as well as for windshields, the judge, in his discretion, could determine that Volkswagen's responses were relevant to show its knowledge of the benefits and feasibility of gluing.[11]

(c) The third item claimed to be erroneously admitted was Federal Motor Vehicle Safety Standard 217, 49 C.F.R. § 571.217 (1980).[12] That standard is a performance standard for buses, not vans, and should not have been admitted. We do not, however, think the error requires reversal.

Prior to the admission of Standard 217, a former engineer at Ford was asked the basis of his opinion that the design of the Volkswagen window retention system was defective. Although the defendants objected to that question, they did not object to his being questioned as to certain tests he had performed while at Ford. His testimony, set forth in the margin,[13]

---

[11] The defendant's additional claim that the plaintiff misrepresented the defendants' position regarding side window design does not bear on the relevancy of the evidence. The judge, in his discretion, could find that the probative force of the evidence outweighed the prejudice, if any.

[12] The general rule in Massachusetts is that a violation of a safety regulation is admissible as evidence of negligence, but is not conclusive. See *Perry* v. *Medeiros,* 369 Mass. 836, 841 (1976); *MacDonald* v. *Ortho Pharmaceutical Corp.,* 394 Mass. 131, 139-140, *cert. denied,* 474 U.S. 920 (1985); *Rice* v. *James Hanrahan & Sons,* 20 Mass. App. Ct. 701, 707-708 (1985).

[13] Q. "And what is the basis for that opinion, sir?"
COUNSEL FOR DEFENDANTS: "Objection, Your Honor."
THE COURT: "He may have it."
A. "I would go back into my experience in designing glass in windshield retention systems for many years in the automotive industry, I would take into consideration the fact that during the development of the 1975 Econoline I was given the assignment in approximately 1973 or '74 to develop a retention — a windshield retention — system and a side glass retention system for the Econoline van, and during that time we made at Ford Motor a comparative analysis of all of the domestic vans, including the Volkswagen, we conducted pushout tests on the windows of all of these vans at our competitive garage —"
Q. "What are pushout tests?"
A. "Pushout tests are tests that the domestic manufacturers are required to conform to, to conform to Federal standard 217, which is bus window retention."

was that the Volkswagen van did not meet Standard 217. Al-
though later, more specific references to Standard 217 were
made,[14] the most unfavorable evidence on this point was before

---

Q. "And would you go on with your testimony with regard to conducting
those pushout tests."
A. "Yes. As we were developing our comparative analysis, we found
that the systems on the Ford Econoline, the Chevy, the Dodge met the
requirements of Standard 217, but that the system for — did not pass for
the Volkswagen, for the push-on, pushout tests."

[14] Q. "Now, when you did the pushout tests in 1973 to 1975 that you
described, did the Volkswagen glass come out more easily than the glass
from the other manufacturer?"
A. "Yes, it did."
Q. "And would you describe how that occurred, Mr. Camps?"

. . .

A. ". . . one of the ways of passing the test was to exert 1200 pounds
of pressure . . . and when we reached 1200 pounds of pressure, we knew
we passed the test. But, rather than stop there, and since we were in the
process of testing anyway, we pushed to destruction, so that we would
know what our safety limit was. So, we would have passed the test at 1200
pounds and maybe pushed to 1500 and the glass would break at 1500; we
knew we had a 300 pound safety margin in our glass-retention system."
Q. "And with regard to Volkswagen?"
A. "I can't remember the exact numbers, Mr. Flynn; I do remember
that my senior management made it very clear to me that they did not want
me to use anything resembling the Volkswagen weatherstrip on a Ford
product."
COUNSEL FOR DEFENDANTS: "May that be stricken, your Honor?"
THE COURT: "No, it may stand."
Q. "Did the Volkswagen window retention system fail the test?"
A. "Yes, it did. It did not reach 1200 pounds on any of the tests we
conducted."
Q. "Now, that performance standard of 1200 pounds, was that placed
in the Federal Regulations?"
A. "Yes."
Q. "And was that Federal Standard 217?"
COUNSEL FOR DEFENDANTS: "I pray Your Honor's judgment."
THE COURT: "He may have it. What's the answer?"
A. "Yes, it was."
Q. "And what does Federal Standard 217 relate to?"
COUNSEL FOR DEFENDANTS: "I pray Your Honor's judgment."
THE COURT: "He may have it."
A. "Federal Standard 217 relates to bus window retention, and the
domestic manufacturers will manufacture a vehicle that can be used for

the jury without objection before Standard 217 was admitted. An examination of the witness's entire testimony, including cross-examination, leads us to conclude that the error, while troublesome, did not mislead the jury. The evidence was clear that the van did not fall within within the definition of a bus.[15]

6. *Impeachment of Dr. Brenner.* The judge refused to allow defense counsel to impeach Dr. Brenner by use of his deposition testimony. At his deposition, Dr. Brenner disclaimed being an expert at reconstruction. After having been shown several pictures of the accident by the defendants, he stated that it was his opinion that two configurations of glass came from certain windows of the van. In his testimony at trial, he thought that the two piles came from different windows. The judge gave two reasons for refusing to allow the introduction of the deposition testimony. One, the jury could observe the photographs as well as Dr. Brenner and did not need any expert testimony on this issue. Also, the judge did not consider the statements inconsistent because Dr. Brenner indicated at trial that he did not really have an opinion. We think the limitation of cross-examination was within the judge's discretion and he could determine that there was here no relevant inconsistency. See *Commonwealth* v. *Hesketh,* 386 Mass. 153, 161 (1982).

7. *Bias of the judge.* The defendants' counsel by affidavit charged the judge with making statements that he considered Volkswagens unsafe. The judge in the course of a hearing on

---

transportating school children up to twelve or fourteen passengers, and it's also used as a prison van."

After some further discussion, and over defendants' objection on the ground of relevancy, a certified copy of Standard 217 was admitted.

[15] Counsel also brought this out forcefully in closing argument: "Additional smoke came into this case. We heard a great deal of testimony about Federal Motor Vehicle Standard 217. 217 [is] a pushout test for buses. This is not a bus. Mr. Camps testified that the Ford Motor Company conducted the pushout test prescribed in 217 on the van, on the VW van, and it failed that test. I suggest that that has absolutely no application to this case; [that] was the pushout test for buses. Admittedly, the plaintiffs say that this vehicle is not required to comply with bus requirements under 217. That's more smoke. What the pushout requirements are for buses has got nothing to do with this VW van."

the defendants' motion for a new trial, brought on this and other grounds, denied making the statements. Counsel for the plaintiff in his affidavit stated that "counsel for the defendant has totally mischaracterized, taken out of context and distorted the true nature of what was discussed in chambers." Our review of the entire proceedings reveals no bias on the part of this experienced trial judge. The conference at which the alleged statements were made was unrecorded. The claim, at least for purposes of review, is entirely without merit.[16] The judge was not required to withdraw.

8. *Instruction on damages.* The wrongful death statute, G. L. c. 229, § 2, as appearing in St. 1973, c. 699, § 1, in relevant part provides that a person who

> "[i] by his negligence causes the death of a person . . . or [v] is responsible for a breach of warranty . . . which results in injury to a person that causes death, shall be liable in damages in the amount of: (1) the fair monetary value of the decedent to the persons entitled to receive the damages recovered; as provided in section one, including but not limited to compensation for the loss of the reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice of the decedent to the persons entitled to the damages recovered."

The defendants sought an instruction expressly precluding the jury from awarding damages to "compensate the decedent's next-of-kin for any emotional distress or pain and suffering or grief which they may have suffered." The judge did not give the instruction and charged the jury in the words of the statute.

---

[16] We also reject the defendants' allegation concerning improper behavior on the part of plaintiff's counsel in questioning a photographer. A response was elicited which may have suggested that Volkswagen had misrepresented to the photographer that it sought the photographs on behalf of the family. The trial judge found no prejudice and we see nothing in the record requiring a different result. We defer to his discretionary ruling. *Torre* v. *Harris-Seybold Co.,* 9 Mass. App. Ct. 660, 664 (1980).

He read to them, on two occasions, most of the language of cl. (1) quoted above, and explained the elements to be recovered. He did not mention "grief." Whether there was error in the denial of the requested instruction depends on what damages are recoverable under our wrongful death statute, and also depends on whether the trial judge was adequately apprised by counsel that the ordinary words in the statute had, perhaps, a more limited meaning.

State wrongful death statutes differ widely in their provisions. A dwindling minority of States limit such recovery to economic losses, that is, to the financial contributions the decedent would have made to his dependents. Others, like Massachusetts, specifically allow recovery for more intangible losses, such as loss of society, companionship, comfort, and the like. A minority, but an increasing number,[17] allow recovery for grief, sorrow, and mental distress suffered by the decedent's survivors. For a collection of statutes and authorities see 2 Speiser, Recovery for Wrongful Death, Appendix A (2d ed. 1975), and 1 Speiser §§ 3:49 and 3:52.

The defendants in their appellate brief have brought to our attention certain legislative history of our wrongful death statute contained in 1973 Senate Journal 2058, 2071. This material, which was not given to the trial judge, suggests that recovery under c. 229, § 2, was not intended to include components of "grief, anguish and bereavement of the survivors."[18]

Senate Bill 579 of 1973, as originally passed by both houses, had three paragraphs relating to recovery: paragraph (1) previ-

---

[17] See Prosser & Keeton, Torts § 127, at 952 & n.84 (5th ed. 1984).

[18] We do not think that *Miles* v. *Edward O. Tabor, M.D., Inc.,* 387 Mass. 783, 788-789 (1982), requires a contrary conclusion. In that case the Supreme Judicial Court held that where a mother's symptoms of emotional distress did not occur until after the death of her child some two months after birth, there was insufficient evidence that she suffered "emotional distress at [his] birth which was distinct from the claim of wrongful death." While some of the language of the opinion at 788-789 may suggest tangentially that damages for her grief from the death could be recovered in a wrongful death action, the construction of the statutory language of c. 229, § 2, was not directly before the court, and the legislative history of the provision was not brought to its attention.

ously quoted in this opinion, paragraph (2) which provided for funeral expenses and a third paragraph which provided for "fair compensation for the grief, anguish and bereavement of the survivors." Paragraphs one and two were retained and appear in G. L. c. 229, § 2. Paragraph three was deleted from the bill after receipt of the Governor's communication discussed in the margin.[19]

The statute, which uses simple everyday words, may not be unclear to the lay mind. When studied in the historical context of wrongful death statutes, however, we think the provision presents sufficient ambiguity to warrant consideration of its legislative history. That history includes "formal communications from the Governor to the General Court in returning bills submitted to him for action." *Taplin* v. *Chatham,* 390 Mass. 1, 5 (1983). The deletions in the bill after the return by the Governor suggest that the Legislature did not intend to allow compensation for the items omitted. As the defendants note in their appellate brief, a similar exclusion from recovery for wrongful death was recognized by the United States Supreme

---

[19] In August, 1973, the Governor favored the proposed legislation insofar as it provided that recovery for wrongful death, which up to that time was determined on a punitive basis, would be compensatory. See note 27, *infra.* In returning the bill to the Legislature, he stated, however, that he was not persuaded that the statute "should also authorize . . . compensation for [the items in paragraph 3] . . . . I question the wisdom of the Commonwealth's shifting from one minority among the states (those allowing only punitive damages) to another minority (authorizing compensation for grief, anguish, and bereavement). Recovery for such factors is not consistent with the underlying premise of this legislation — that certain individuals should be permitted recovery for certain "benefits" such as income and companionship which they received from the decedent and would have continued to receive if he or she were alive. I am also concerned that the inclusion of such an element of monetary damages — one so difficult of calculation on any rational basis — will actually hinder a bereaved individual in recovering damages by prolonging until the time of trial the resolution of the dispute between the parties. In addition, I believe that allowing such compensation for 'the survivors' will present courts with the burden of defining or limiting the scope of this class of people. No such problem exists with respect to those entitled to recover for income, companionship, etc., because this class is limited by this bill's reference to those specifically permitted recovery by c. 229, s. 1." 1973 Sen. Doc. No. 1860, at 3-4.

Court in *Sea-Land Services, Inc.* v. *Gaudet,* 414 U.S. 573, 585 n.17 (1974).[20]

The trial judge was not informed of the complexity of the issues presented by the request for the instruction. On the morning of closing argument, the plaintiff and the defendants each submitted to the judge their requests for jury instructions. The defendants' requested instruction with its citations as presented to the judge is set forth in the margin.[21] The reference to the Massachusetts case of *Cimino* v. *Milford Keg, Inc.,* 385 Mass. 323, 334 (1982), was not helpful because the "emotional distress" defined therein[22] was not in any way an issue in this case. Moreover, as indicated in note 18, *supra,* a later case, *Miles* v. *Edward O. Tabor, M.D., Inc.,* 387 Mass. 783, 788-789 (1982), intimated that even the grief portion of the request

---

[20] In extending the judge-made (not statutory) maritime wrongful-death remedy, a majority of the Supreme Court in the *Sea-Land* case held that it included compensation for loss of society, comfort and the like. In n.17 at 585-586, in part quoting Speiser, Recovery for Wrongful Death § 3.45, at 223 (1966) (the Speiser material appears in single quotes below) Justice Brennan, writing for the majority, stated, "Loss of society must not be confused with mental anguish or grief, which is not compensable under the maritime wrongful-death remedy. The former entails the loss of positive benefits, while the latter represents an emotional response to the wrongful death. The difference between the two is well expressed as follows: 'When we speak of recovery for the beneficiaries' mental anguish, we are primarily concerned, not with the benefits they have lost, but with the issue of compensating them for their harrowing experience resulting from the death of a loved one. This requires a somewhat negative approach. The fundamental question in this area of damages is what deleterious effect has the death, as such, had upon the claimants? In other areas of damage, we focus on more positive aspects of the injury such as what would the decedent, had he lived, have *contributed* in terms of support, assistance, training, comfort, consortium, etc.'" (emphasis original).

[21]                    "Emotional Distress.

"Should you find that the plaintiff is entitled to an award of damages, I instruct you that you may not award any damages to compensate the decedent's next-of-kin for any emotional distress or pain and suffering or grief which they may have suffered. *Cimino* v. *Milford Keg, Inc.,* 385 Mass. 323, 334 (1982); *Krouse* v. *Graham,* 562 P.2d 1022 (Cal. 1977)."

[22] The term "emotional distress" was defined in *Cimino,* at 334, as "a severe psychological shock directly resulting from experiencing or witnessing the effects of a defendant's conduct." There was here no evidence of this kind of shock.

was incorrect. The mere citation to a California case, see note 22, *supra,* (it does not appear that a copy of the case was even given to the trial judge) did no more than indicate that other jurisdictions, perhaps having different statutes (as does California), might support the giving of the instruction.

Prior to final argument, the judge, on the Friday morning before the Monday on which he was to charge the jury, asked counsel whether they wished him to indicate which requests he would grant. The defendants' counsel said that he would "just as soon get on with the argument, and get this thing to the jury." On Friday afternoon, after final argument, the judge discussed the plaintiff's amended complaint and the special questions to be given to the jury. Although there was opportunity to discuss the instruction, no mention of it was made at that time. On Monday morning, prior to the jury charge, the judge and counsel again conferred about the matters to be submitted to the jury and, again, there was no discussion of the instruction. After the judge gave his charge, the defendants' counsel objected to the judge's failure to give his requests, naming them by number. When he named No. 29,[23] the judge said, "Wait a second. Let me look at it." Defendants merely stated, "No damages for the emotional distress, pain and suffering." There was no further mention of the instruction nor does the record indicate that any memorandum of law was ever given to the judge on this issue.

As the matter appears on the record before us, the judge was not sufficiently apprised of the specific ground relied on by the defendants as required by Mass.R.Civ.P. 51(b),[24] 365

---

[23] The number should have been No. 28, but the error is immaterial.

[24] The rule provides: "At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury."

Mass. 816 (1974). The objection by number, even with the brief repetition of what the instruction was about, did not explain to the judge that in the defendants' view there was an inherent legal ambiguity in the statute which needed clarification. The objection did not have the "practical effect" of informing the judge why the requested instruction should have been given, *Narkin* v. *Springfield,* 5 Mass. App. Ct. 489, 491 (1977), and cases cited; *Huff* v. *Holyoke,* 386 Mass. 582, 583 n.2 (1982), and was not adequate to give him reason to believe his charge was incorrect. Fairness and the duty to avoid unnecessary new trials require that the grounds of an objection be detailed for the judge's benefit. *Miller* v. *Boston & Me. Corp.,* 8 Mass. App. Ct. 770, 774 (1979). See *Collins* v. *Baron,* 392 Mass. 565, 568 n.3 (1984), and at 571-573 (O'Connor and Lynch, JJ., dissenting). See also Smith & Zobel, Rules Practice § 51.6, at 230 (1977).

We also note that the requested instruction was not itself correct. See *Squires* v. *Fraska,* 301 Mass. 474, 476-477 (1938); *Ferguson* v. *Ashkenazy,* 307 Mass. 197, 203 (1940) (both cases holding that a trial judge need not separate the correct from the incorrect part of a requested instruction and give the correct part). Not only does "emotional distress" have a particular meaning which is here inapplicable, see note 22, *supra,* but "pain and suffering," in the wrongful death context, usually refers to pain and suffering of the decedent rather than to that of the survivors. The legislative history suggests that what may be intended to be excluded is the acute sorrow of the mourning period, or, perhaps, in the case of more sensitive survivors, the unusual response to the death, e.g., a nervous breakdown. These items are what were referred to in *Sea-Land,* see note 20, *supra,* as the "negative approach."

While, after study, we now think a simple instruction calling for the exclusion of grief, anguish, and bereavement of the survivors would have been proper and advisable, and that such an instruction would be helpful in future cases, we do not think it was error for the judge, on the record before him, to instruct

the jury as he did in the words of the statute.[25] In reaching this conclusion, we note that there was no objection to the testimony of Karen's father, the only witness from her family. His very brief testimony placed no emphasis on grief or anguish and concerned primarily the appealing, unselfish, and public minded qualities of Karen and the resulting loss to her family.

9. *Excessive damages.* The verdict here was large. The defendants, at great length, seek to show that the judge erred in denying a remittitur or a new trial on the ground that the damages were excessive.[26] In a case of this kind damages are difficult to compute and depend upon the judgment of the fact-finding tribunal in appraising the deprivations and "translating them into a compensatory sum." *Bartley* v. *Phillips,* 317 Mass. 35, 40 (1944). "In . . . an appellate tribunal an award of damages must stand unless . . . to permit it to stand was an abuse of discretion on the part of the court below, amounting to an error of law." *Mirageas* v. *Massachusetts Bay Transp. Authy.,* 391 Mass. 815, 822 (1984), quoting from *Bartley* v. *Phillips,* 317 Mass. at 43. "An appellate court will not find an abuse of discretion in the judge's refusal to grant a new trial on the ground of excessive damages '[u]nless the damages awarded were greatly disproportionate to the injury proven or represented a miscarriage of justice.'" *Mirageas, supra,* quoting from *doCanto* v. *Ametek, Inc.,* 367 Mass. 776, 787 (1975). "We cannot say that there was this type of error on the part of the trial judge who heard and saw the witnesses." *Statkus* v. *Metropolitan Transit Authy.,* 335 Mass. 172, 174-

---

[25] In this connection, we observe that Speiser (the commentator quoted by the United States Supreme Court in *Sea-Land,* see note 20, *supra,* when it adopted the distinction between the positive benefits lost by the survivors for which recovery may be allowed and their harrowing experience for which compensation is denied), in his treatise includes a suggested jury instruction for jurisdictions allowing recovery for loss of society. That instruction is in the form essentially given here by the judge and does not add that there is to be no recovery for items such as grief. 1 Speiser § 3:51.

[26] The plaintiff argues that the defendants, by not objecting to the verdict at the time it was returned, did not make a timely claim. This contention is without merit. Mass.R.Civ.P. 59(b), 365 Mass. 827 (1974).

175 (1956). We also decline the defendants' invitation to engage in the "dangerous game" of reasoning from verdicts in other jurisdictions. *Griffin* v. *General Motors Corp.*, 380 Mass. 362, 371 (1980).[27]

10. *Prejudgment interest.* After the court clerk added interest to the verdict at the rate of twelve percent per annum, the defendants brought a motion under Mass.R.Civ.P. 60(a), 365 Mass. 828 (1974), to correct the judgment. The denial of the motion was error. General Laws c. 229, § 11, governs the assessment of prejudgment interest. See *Turcotte* v. *DeWitt,* 333 Mass. 389, 391 (1955). Since the rate is unspecified, G. L.

---

[27] Our reluctance to interfere with the verdict is reinforced by the history of legislative concern, which has recently been heightened, with whether limits should be imposed on the amounts to be recovered in this area of tort law. While the statute does not now limit the amount which can be awarded, the absence of a cap is a relatively new development. For seventy-five years, from 1898 when the first generally applicable wrongful death statute was adopted in Massachusetts, St. 1898, c. 565 (prior to that time recovery could only be obtained against certain classes of defendants, see *Gaudette* v. *Webb,* 362 Mass. 60, 66-67, n.4 [1972]), until the adoption of St. 1973, c. 699, § 1, the wrongful death statute set a ceiling on the amount that could be recovered. Prior to 1973, the range of recovery was between $5,000 and $200,000 "to be assessed with reference to the degree of culpability" of the defendant. It is only for the last thirteen years, since the passage of the 1973 statute, that there has been no limit on the amount which can be awarded. See *Doyon* v. *Travelers Indemnity Co., ante* 336, 338 (1986).

We note that in recent months the Massachusetts Legislature, as well as Congress, has shown concern over the size of verdicts in tort cases. The question of a ceiling on awards is very much in the forefront. See 1986 House Doc. No. 5700, a bill recently passed by the Massachusetts House of Representatives, which would put a $500,000 ceiling on medical malpractice awards (including those for wrongful death) for such items as pain and suffering and loss of companionship. See also S. 2046, 99th Cong. 2d Sess. (1986), on which the Judiciary Committee began hearings in February, 1986, proposing to insert a new chapter 135 in Part V of Title 28, which, among other things, would place a limit of $100,000 on recovery for "noneconomic" damages. (Noneconomic damages are defined as "losses for pain, suffering, inconvenience, physical impairment, disfigurement, and other nonpecuniary losses.) See also Report of the Tort Policy Working Group on the Causes, Extent and Policy Implications of the Current Crisis in Insurance Availability and Affordability, Recommendation No. 4, at 66 (U.S. Gov't. Printing Office: 1986-491-510: 40090, February, 1986), advocating that a $100,000 limit be placed on "non-economic" damages.

c. 107, § 3, applies. *Perkins Sch. for the Blind* v. *Rate Setting Commn.,* 383 Mass. 825, 835-836 (1981). *Peak* v. *Massachusetts Bay Transp. Authy.,* 20 Mass. App. Ct. 726, 728 (1985). Interest should have been computed at six percent.

11. *Credit for settlement.* Before the verdict the parties filed a stipulation in which they agreed that the sum of $67,000, which was paid by insurers to the plaintiff in settlement of certain claims, "shall be *deducted from the jury verdict,* if any." (Emphasis supplied.) The $67,000 was deducted from the sum of the verdict plus interest. This was error in view of the agreement. Compare *Boston Edison Co.* v. *Tritsch,* 370 Mass. 260, 263-264 (1976), and *Franklin* v. *Guralnick,* 394 Mass. 753, 754-755 (1985). The $67,000 payment should have been subtracted from the jury verdict before the computation of prejudgment interest.

Because of the matters discussed in parts 10 and 11, *supra,* the matter is remanded to the Superior Court to deduct the settlement figure from the verdict and to recompute prejudgment interest. In all other respects the judgment and the order denying the defendants' motion for judgment notwithstanding the verdict or for a new trial are affirmed.[28]

*So ordered.*

---

[28] For postjudgment interest on the award, see *Peak* v. *Massachusetts Bay Transp. Authy.,* 20 Mass. App. Ct. at 729.