## RODDY & McNULTY INSURANCE AGENCY, INC. *vs.* A. A. PROCTOR & CO., INC.

Middlesex. June 20, 1983. — August 17, 1983.

Present: ARMSTRONG, GREANEY, & DREBEN, JJ.

*Practice, Civil,* Severance of claims. *Contract,* What constitutes, Performance and breach, Modification.

Where the judge in a civil action, on his own motion, had severed the plaintiff's claim under the Consumer Protection Act from its contract claim then being tried to a jury and where the parties apparently agreed that the plaintiff must succeed on the contract claim in order to prevail on the claim under the Consumer Protection Act, this court considered the merits of an appeal from the entry of judgment n.o.v. on the contract claim, even though the judgment appealed from may not have been a complete adjudication under Mass.R.Civ.P. 54 (b). [526-530]

Where an agreement between two collaborating insurance agencies, dealing with the allocation between them of commissions on certain insurance sales, had been completed in written form and signed on behalf of the parties following an extended period of discussion and negotiation, and where thereafter the parties conducted their affairs under the agreement for two years, a jury could properly find that a firm agreement had been reached, notwithstanding language in the document characterizing it as "tentative" and contemplating its review by legal counsel, and that the parties had mutually acquiesced in its provisions as the final expression of their contract. [530-533]

An agreement among two insurance agencies and an association of automobile dealers, under which the association undertook to "sponsor" a line of insurance written by the agencies, had the effect, as matter of law, of modifying the termination provisions of an earlier agreement between the agencies allocating between them the commissions on insurance to be sold as the result of the anticipated sponsorship, so that, in an action by one of the agencies seeking to recover commissions allegedly due from the other, no breach of the earlier agreement was shown by evidence as to commissions for renewals beyond the termination of that agreement as so modified. [533-537]

CIVIL ACTION commenced in the Superior Court Department on May 9, 1979.

The case was tried before *Mitchell, J.*

*Ronna D. Howard (Edmund M. Hurley* with her) for the plaintiff.

*Alan G. Miller (Peter C. Knight & D. Alice Olsen* with him) for the defendant.

GREANEY, J. This lawsuit was brought in the Superior Court by the plaintiff (an insurance agency) alleging that the defendant (also an insurance agency) had committed a breach of contract and violated G. L. c. 93A by refusing to pay commissions on insurance business referred to the defendant by the plaintiff pursuant to the terms of an agreement signed by their respective principals on September 30, 1975. Prior to the commencement of trial before a jury, the judge, on his own motion, ordered the c. 93A claim "severed" from the contract claim and tried "jury waived." A counterclaim by the defendant was dismissed at the close of the evidence and is not involved in the appeal. The jury returned a verdict for the plaintiff on the contract claim in the amount of $171,917.14, and judgment was entered in accordance with the jury's verdict. The defendant filed a timely motion for judgment notwithstanding the verdict (judgment n.o.v.),[1] which the judge allowed "on the ground that the agreement of September 30, 1975, was an agreement to agree and not a contract." From the superseding judgment dismissing its action, the plaintiff has appealed. After discussing the implications of the severance order, we uphold the judgment notwithstanding the verdict, doing so on a ground different from the one relied upon by the judge.

1. We first consider whether, in view of the fact that the c. 93A claim is still pending under the order of severance, the appeal is premature as one brought from a judgment which adjudicates fewer than all the claims in the case and

---

[1] This motion had been preceded by motions for a directed verdict under Mass.R.Civ.P. 50(a), 365 Mass. 814 (1974), filed and denied at the end of the plaintiff's case and at the close of all the evidence.

is not accompanied by a determination by the trial judge that there is no just reason to delay entry of judgment. See Mass.R.Civ.P. 54(b), 365 Mass. 821 (1974); *J.B.L. Constr. Co.* v. *Lincoln Homes Corp.,* 9 Mass. App. Ct. 250, 252-253 (1980).

The precise basis for the judge's order separating the claims is not clear. While labelling his order an order of severance, the judge may have been acting pursuant to Mass.R.Civ.P. 42(b), which permits the separate trial of any claim "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy,"[2] rather than the last sentence of Mass.R. Civ.P. 21, which permits "[a]ny claim against a party [to be] severed and proceeded with separately."[3] Although the two rules appear to confer similar authority,[4] the language

---

[2] The text of rule 42(b), 365 Mass. 805 (1974), reads as follows: "(b) Separate Trials. The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial in the county where the action is pending or in a different county of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the Constitution of this Commonwealth or as set forth in a statute."

[3] The text of rule 21, 365 Mass. 767 (1974), reads as follows: "Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative, after hearing, at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately."

[4] One other rule contains a provision for separate trials. Massachusetts R.Civ.P. 20(b), 365 Mass. 766 (1974), provides as follows: "The court may make such orders as will prevent a party from being embarrassed, delayed, or put to expense by the inclusion of a party against whom he asserts no claim and who asserts no claim against him, and may order separate trials or make other orders to prevent delay or prejudice." In conjunction with the provision in rule 20(a), 365 Mass. 766 (1974), for permissive joinder, rule 20(b) operates "to allow virtually unlimited joinder at the pleading stage but to give the . . . court discretion to shape the trial to the necessities of the particular case. . . . Aside from emphasizing the availability of separate trials, Rule 20(b) has little significance inasmuch as the power granted the court therein also is provided by the much broader grant of discretion set forth in Rule 42(b)." 7 Wright & Miller, Federal Practice and Procedure § 1660 (1972).

of rule 21 dealing with severance was inserted by the drafters of the civil rules in the context of provisions addressing misjoinder of parties. This suggests that severance under rule 21 may be principally directed to the separation of claims within multiclaim litigation because of the peculiar relationship or status of parties with respect to particular claims.[5] See generally Smith & Zobel, Rules Practice § 21.2 (1975); 3A Moore's Federal Practice par. 21.05[2], at 21-41 to 21-44 (2d ed. 1982). Some examples of the use of the severance power in rule 21 in precisely this manner can be seen in *Sporia* v. *Pennsylvania Greyhound Lines, Inc.*, 143 F.2d 105, 107 (3d Cir. 1944) (severance ordered where defendant sought to implead one of two plaintiffs who had joined to assert individual tort claims); *Jennings* v. *Beach*, 1 F.R.D. 442, 443 (D. Mass. 1940) (severance ordered to cure misjoinder); and *Thee* v. *Marvin Glass & Associates*, 412 F. Supp. 1116, 1117, 1121 (E.D.N.Y. 1976) (severance ordered where venue not proper as to all defendants).

Rule 42(b), on the other hand, appears to be devoted to the convenience of adjudication, the avoidance of prejudice and the interests of expedition and economy as dictated by the characteristics and elements of proof of the claims themselves. See Smith & Zobel, Rules Practice § 42.4 (1977). The following sampling shows the utilization of rule 42(b) to further these purposes: *Western Geophysical Co. of America, Inc.* v. *Bolt Associates*, 50 F.R.D. 193, 194 (D. Conn. 1970) (separate trial ordered for counterclaim for patent infringement brought in breach of contract action); *Cohen* v. *District of Columbia Natl. Bank*, 59 F.R.D. 84, 88 (D.D.C. 1972) (separate trials ordered as to each of the several defendant banks in usury case because of the potential for prejudice inherent in keeping track of the banks' differing practices and policies with respect to the subject

---

[5] For a detailed discussion of the "reasonably convincing argument [which] can be made that severance under Rule 21 was originally intended to deal solely with the problem of misjoinder of parties," see 3A Moore's Federal Practice par. 21.05[2], at 21-41 n.12 (2d ed. 1982).

loans); *Washington Whey Co.* v. *Fairmont Foods Co.,* 72 F.R.D. 180, 182 (D. Neb. 1976) (separate trial ordered for counterclaims alleging antitrust violations and unfair competition brought in contract action). Although both rules have different objectives and ordinarily should not overlap, they share a common bond by conferring discretion upon trial judges to deal with the exigencies of litigation by separating parties, claims, and issues in order "to secure the just, speedy and inexpensive determination of every action." Mass.R.Civ.P. 1, as appearing in 385 Mass. 1214 (1982).

The question of which rule governs is not without significance. Respected authorities on civil procedure agree that claims properly severed under rule 21 take on lives of their own and become independent actions upon which separate appealable judgments may enter. See 9 Wright & Miller, Federal Practice and Procedure § 2387 (1971); 3A Moore's Federal Practice, *supra* at 21-39. The separate trial procedure of rule 42(b), however, "usually" results in one judgment, Wright & Miller, *supra,* which would not be appealable until all the claims in the case have been wrapped into it.[6] "Unfortunately this distinction, clear enough in theory, is often obscured in practice since at times the courts talk of 'separate trial' and 'severance' interchangeably." *Ibid.*

The separation for trial by the court of a c. 93A claim from a companion contract claim being tried to a jury is not based upon party-oriented issues such as joinder. Rather separation in the typical case (i.e. one involving a c. 93A and a common law claim from which the c. 93A claim arises) is premised on the nature of the c. 93A action, specifically the lack of a right to jury trial on the underlying assertion of unfair, deceptive or anticompetitive conduct. See *Nei* v. *Burley,* 388 Mass. 307, 311-315 (1983). As a consequence, the separation of claims in the conventional c. 93A setting appears more appropriately made under rule 42(b) than

---

[6] The word "usually" is chosen with care because "Rule 42(b) separation may [also] produce individual judgments, as for example, if the court orders a separate trial of a counterclaim, cross-claim or third-party claim." Smith & Zobel, *supra* at § 42.3.

under rule 21. This case represents the commonplace litigation described in which separation should have been handled under rule 42(b) with final judgment to await resolution of all the claims. The parties appear to agree, however, that if the judgment n.o.v. is upheld, the c. 93A claim fails. To put the parties through the exercise of "trying" the c. 93A case in these circumstances would be contrary to the purposes of the Massachusetts Rules of Civil Procedure expressed in rule 1, *supra*. We conclude that the merits should be decided despite the possibility that the judgment is not a complete adjudication by rule 54(b) standards.

2. In deciding whether the judge acted properly in entering the judgment n.o.v., we apply the same standard of review as would apply to a review of a motion for a directed verdict. *D'Annolfo* v. *Stoneham Housing Authy.*, 375 Mass. 650, 657 (1978). *Moran Travel Bureau, Inc.* v. *Clair*, 12 Mass. App. Ct. 864 (1981). The weight of the evidence standard is not involved, the determination focusing instead on whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff." *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972), quoting from *Kelly* v. *Railway Exp. Agency, Inc.*, 315 Mass. 301, 302 (1943). *Miles* v. *Edward O. Tabor, M.D., Inc.*, 387 Mass. 783, 785-786 (1982).

Viewing the evidence in this light, the jury could have found the following facts. Beginning in 1973, the parties were jointly engaged in marketing a package of insurance coverages for automobile dealers which was known as "Auto-Pac." At some point in 1974 there apparently was an expression of interest by the Massachusetts State Automobile Dealers Association (MSADA) in sponsoring the parties' insurance program. Up to this point the parties had conducted their mutual business pursuant to an oral understanding. In anticipation of the sponsorship, John F. McNulty, president of the plaintiff, prepared a draft agreement under date of November 20, 1974, covering such topics as the division

of costs and commissions and other aspects of the relationship with respect to insurance business which would be written as a consequence of obtaining MSADA sponsorship. The proposed agreement was extensively negotiated and modified by McNulty and by David A. Proctor, president of the defendant, but was never executed.

MSADA sponsorship did not materialize in 1974. The prospect of sponsorship arose again in 1975, however, and a draft of a new agreement was prepared. McNulty and Proctor met in Proctor's office on September 30, 1975, to discuss the draft. After approximately four hours of discussion and negotiation, which led to numerous handwritten changes and additions to the typed document, the two men signed the agreement. The agreement provided that the plaintiff would receive one third of the net commissions for business written by the defendant as a result of the sponsorship for as long as the accounts continued to be written with the defendant, with contingent commissions to be split equally. Other provisions of the agreement dealt with responsibility for the cost of obtaining MSADA sponsorship and the question of to whom various types of insurance accounts belonged. The agreement was to supersede all previous understandings and was to be terminable by either party only for "cause", which was to be determined by a representative of each party and a third person chosen by the representatives. The agreement also contained a handwritten clause which read as follows: "Tentative agreement between the parties in lieu of formal agreement to be prepared [and] reviewed by legal counsel and to be completed by 12/31/75."

A few days after the agreement was executed, the parties learned that MSADA sponsorship had been awarded to the plaintiff for the insurance program effective January 1, 1976. Commission payments were made in accordance with the agreement's terms thereafter, rather than on the sliding twenty to fifty percent scale which had existed under the oral understanding. The defendant continued to remit payments under the 1975 agreement until March, 1978, for

commissions earned through December 31, 1977, when sponsorship terminated.

The threshold question is whether the parties had reached an enforceable agreement on September 30, 1975, in view of the language in the September 30, 1975, document characterizing the writing as "tentative" and contemplating its review by legal counsel. The judge ruled that no binding agreement had been reached, relying on the maxim that "[a] purported contract which is no more than an agreement to agree in the future on essential terms, or one which does not adequately specify essential terms, ordinarily will be unenforceable." *Air Technology Corp.* v. *General Elec. Co.*, 347 Mass. 613, 626 (1964), and cases cited.

The general principle expressed in the *Air Technology* case is subject to exception. "If all the material terms which are to be incorporated into a future writing have been agreed upon, it may be inferred that the writing to be drafted and delivered is a mere memorial of the contract, which is already final by the earlier mutual assent of the parties to those terms." *Rosenfield* v. *United States Trust Co.*, 290 Mass. 210, 216 (1935), and cases cited. The jury could have found that the 1975 agreement was the product of arm's-length negotiations and followed several years of close collaboration between the two companies and their principals. The document was in evidence. It contains a number of handwritten and initialed additions, deletions and modifications, including the quoted clause written in McNulty's hand. Casual examination reveals that the agreement would benefit from retyping and, in some respects, restatement of terms. We think the evidence, particularly the testimony of McNulty, taken under the "any set of circumstances" test, would have warranted the jury in finding: (1) that the parties had reached a firm agreement and that their intent in the quoted clause was to have a clean copy of the agreement prepared incorporating the numerous manuscript changes, and (2) that counsel was to be employed to embody the changes and new terms inserted by McNulty and Proctor in more "formal" legal language

than that used by the two laymen. In essence, this brings the case within the rule stated in the *Rosenfield* decision and permits a conclusion that a contract existed. On the evidence, it was also open to the jury to infer that any right to insist upon a more "formal agreement" had been waived by the failure of either party to make any effort in that direction by the December 31, 1975, deadline, and by the conduct of their affairs for a period of two years with respect to MSADA-sponsored business under the terms of the agreement. This could have persuaded the jury that the parties had mutually acquiesced in the provisions of the so called "tentative" agreement as the final expression of their contract. We conclude that judgment notwithstanding the verdict should not have been allowed on the ground that there was no contract.

3. Further consideration of the record, however, leads us to conclude that the judgment n.o.v. should be affirmed because the plaintiff failed to establish a breach of the agreement. We summarize the facts the jury could have found on this aspect of the case.

The September 30, 1975, agreement called for the plaintiff to receive certain commissions on "all business written [by the defendant] as a result of the [plaintiff's] obtaining Massachusetts State Automobile Dealer Association sponsorship . . . and including equal split of contingent commissions received for as long as such accounts are written with the [defendant], its heirs or assigns." It was contemplated that the plaintiff's personnel would approach automobile dealers to interest them in a package of insurance coverages tailored to their needs. The plaintiff then would direct prospective customers to the defendant for an analysis of needs and requirements, the making of proposals, and the actual placement of insurance. As indicated, the parties had operated in a similar fashion for several years prior to the execution of the 1975 agreement, and without MSADA sponsorship, under an oral understanding governing the division of commissions. It was thought that access to the dealers would be facilitated by MSADA sponsorship of the insur-

ance program. The plaintiff obtained and held MSADA sponsorship only for the years 1976 and 1977.

Although the parties learned of plaintiff's sponsorship by MSADA shortly after executing this agreement, the sponsorship's terms were not memorialized until October 15, 1976, when an agreement among the plaintiff, MSADA and the Massachusetts State Automobile Dealers Workmen's Compensation Trust was signed. That agreement provided that the plaintiff was to be the sole broker of record for the MSADA sponsored plan and was to receive no renewal commissions or residual benefits in the event of extensions or renewals of insurance beyond the period of the sponsorship. It also provided that the plaintiff was to enter no "co- or sub-agency" or brokerage agreements or arrangements without the prior written approval of the trustees of MSADA. The agreement further stated that it could be terminated by any party without cause by giving timely written notice. Acting pursuant to this provision, MSADA lawfully terminated the sponsorship effective December 31, 1977. Since no new business written after 1977 could have been the result of MSADA sponsorship of the plaintiff, the September 30, 1975, agreement covers, at most, policies first written during 1976 and 1977 and renewals of those policies.

The sponsorship agreement also contained an addendum which was signed by the parties to the main agreement and by Proctor for the defendant, as its president. In the addendum, MSADA consented to the retention of the defendant by the plaintiff "upon such terms and conditions as may be mutually agreed and understood between them, provided it is acknowledged and understood by both . . . as follows: . . . The [plaintiff] is the exclusive broker-of-record acting for and on behalf of the TRUSTEES and MSADA under the aforesaid agreement to which this addendum is appended. The terms of the aforesaid agreement shall, in all respects . . ., control and govern the terms and conditions under which [the defendant] is retained by the [plaintiff] and

provides and otherwise renders any such services to the [plaintiff], the TRUSTEES and MSADA."

The addendum to the MSADA agreement would appear to limit the plaintiff's entitlement to commissions for MSADA-sponsored business strictly to commissions earned in the period during which the plaintiff held MSADA sponsorship. Recognizing the problem created for its case by the 1976 sponsorship agreement, the plaintiff argues that the words "aforesaid agreement" in the quoted passage refer to both the sponsorship agreement and the September 30, 1975, agreement. This interpretation is based on the language in the addendum in which MSADA consented to the defendant's retention by the plaintiff "upon such terms and conditions as may be mutually agreed and understood between them"; a phrase which the plaintiff asserts gives the 1975 agreement some independent significance. The interpretation of the unambiguous language of a written document is a matter of law for the court. *Tri-City Concrete Co.* v. *A.L.A. Constr. Co.*, 343 Mass. 425, 427 (1962). *Sands* v. *Arruda*, 359 Mass. 591, 595 (1971). *Great Atl. & Pac. Tea Co.* v. *Yanofsky*, 380 Mass. 326, 334 (1980). We think it beyond any doubt that the "aforesaid agreement" referred to in the quoted passage pertains to no other document than the main body of the October 15, 1976, sponsorship agreement. The addendum makes it clear that the sponsorship agreement governs "in all respects" the terms "under which [the defendant] is retained by the [plaintiff] and provides and otherwise renders any such services to the [plaintiff], the TRUSTEES and MSADA." It follows, as matter of law, that, by signing the addendum, the parties agreed, in consideration of MSADA's approval of their business arrangement, to modify their 1975 agreement to the extent that any of its terms conflicted with the terms of the sponsorship agreement. The latter provides unequivocally that the plaintiff is not entitled to renewal commissions for periods beyond the period of the sponsorship, i.e., the years 1976 and 1977.

Modifications like the present one have long been recognized in law as valid, without additional consideration, even when based on oral agreements modifying executory written contracts. See *Thomas* v. *Barnes*, 156 Mass. 581, 584 (1892); *DeBlois* v. *Boylston & Tremont Corp.*, 281 Mass. 498, 508 (1933). It makes no difference that the modification appears in a written document to which others, not party to the original agreement, are also signatories. We recognize that, generally speaking, "[t]he question whether a party intends to relinquish his contractual rights by entering into a subsequent agreement is one of fact." *V. & F.W. Filoon Co.* v. *Whittaker Corp.*, 12 Mass. App. Ct. 932, 933 (1981). See also *A. Leo Nash Steel Corp.* v. *Southern New England Steel Erection Co.*, 9 Mass. App. Ct. 377, 383 (1980). The relevant language of the addendum, however, is unambiguous and utterly incapable of any reasonable interpretation other than as an acknowledgement that, as between contradictory provisions of the 1975 agreement and the sponsorship agreement, the parties to the 1975 agreement had agreed that the terms of the sponsorship agreement would govern their rights. We conclude that in the present contract action on the 1975 agreement recovery of commissions for renewals beyond the termination date of the plaintiff's relationship with MSADA is precluded by the modification of the agreement embodied in the addendum. The question of commissions for new business written after MSADA sponsorship ended is beyond the scope of the 1975 agreement.[7]

4. The foregoing considerations reduce the case to the single question whether any commissions are due for 1976 and 1977 in excess of those paid. The plaintiff introduced

---

[7] This ground for a judgment in its favor was raised by the defendant in its motions for directed verdict and judgment n.o.v., both of which challenged the plaintiff's proof of a prima facie case and maintained that the plaintiff was precluded from asserting a contract right to renewal commissions for extensions of policies beyond December 31, 1977, when the sponsorship agreement was terminated. We note that no claim for quantum meruit recovery has been asserted.

no evidence from which it could be found that the defendant had committed a breach of the 1975 agreement by not paying commissions for new business generated by the plaintiff in 1976 and 1977. There was no testimony that any such commissions were still owed, and the documentary evidence did not demonstrate the existence of unpaid commissions for that period.[8] In the final analysis, the plaintiff's evidence, viewed in the light most favorable to it, is insufficient as matter of law to establish a breach of the September 30, 1975, agreement. The judgment notwithstanding the verdict is affirmed.

*So ordered.*

---

[8] The documentary evidence on the issue consisted of a summary sheet showing over $90,000 worth of commissions actually paid by the defendant to the plaintiff for the period in question and computer generated "producer account statements" for the accounts referred by the plaintiff. These statements were compiled monthly and contain a column labeled "commission amount." Handwritten figures appear beside the machine-printed numbers on many of the statements. There was no testimony as to the significance of the handwritten entries. Nor was there any testimony whether the "commission amount" figures were computed in accordance with the 1975 agreement. Finally, there was no testimony concerning the relationship of these figures to the amounts owed or actually paid. The question of any damages that might be due to the plaintiff because of a disparity between the amount owed and the amount paid was left to speculation, see *Lufkin's Real Estate, Inc.* v. *Aseph*, 349 Mass. 343, 346 (1965), leaving breach of the agreement not proved.