MARIE CROALL & another[1] *vs.* MASSACHUSETTS BAY TRANSPORTATION AUTHORITY & another.[2] No. 87-544. August 16, 1988. *Indemnity. Contract,* Indemnity. *Practice, Civil,* Directed verdict, Judgment notwithstanding verdict, Instructions to jury, Argument by counsel, New trial. *Negligence,* Parking attendant's booth, Standard of care. *Evidence,* Competency.

On the morning of April 6, 1979, a fierce gust of wind ripped from its moorings the parking attendant's booth at the North Quincy station of the Massachusetts Bay Transportation Authority (MBTA). Marie Croall, the attendant on duty, had the misfortune to be in the booth when it blew over. She suffered permanent injuries to her neck, legs, and back. Croall brought a negligence action which, after third and fourth party complaints and amendment of the original complaint, involved the following: Croall's employer, Allright Boston Parking, Inc.; the contractor which built the parking facility and erected the booth, Walter Reed Corporation; the manufacturer of the booth, Par Kut International, Inc.; and the MBTA. Her husband claimed loss of consortium. A jury returned verdicts of $340,000 for Croall and $50,000 for her husband against Walter Reed and the MBTA.[3]

Judgments were entered on those verdicts for the plaintiffs against the MBTA, and a judgment of $390,000 plus $19,461.40 in attorney's fees was entered in turn in favor of the MBTA against Walter Reed on a theory of indemnification. On appeal, Walter Reed challenges the determination that it is obligated to indemnify the MBTA, and both defendants make multiple claims of error in the conduct of the trial. We conclude that Walter Reed was not bound to indemnify the MBTA. As to the other claims of error, we are unpersuaded.

---

[1] James Croall.

[2] Walter Reed Corporation.

[3] Allright Boston Parking, Inc., settled, and the jury absolved Par Kut International, Inc., of negligence. They are out of the case.

1. *Indemnification.*[4] Generally the obligation to indemnify another against its own negligence flows from express language. *Great Atl. & Pac. Tea Co.* v. *Yanofsky*, 380 Mass. 326, 334 (1980). *Rathbun* v. *Western Mass. Elec. Co.*, 395 Mass. 361, 363 (1985). Neither the .construction contract nor the specifications for the parking facility job contained an indemnification or hold-harmless clause. The MBTA does not contend otherwise and falls back on an implied obligation of indemnity. See the *Rathbun* case, at 363, and *Shea* v. *Bay State Gas. Co.*, 383 Mass. 218, 222 (1981). In the *Shea* case an obligation of a general contractor to indemnify and hold harmless the design engineer, even against the latter's negligence, was drawn from broad language which appeared in a form of insurance certificate which had been prescribed in the contract documents. The decisive provision in the insurance certificate in the *Shea* case read as follows: "The Contractor shall at all times indemnify and save harmless the OWNER, CAMP DRESSER & McKEE Inc. [the design engineer] . . . on account of any and all claims, damages, losses, . . . arising out of injuries . . . *caused in whole or in part by the acts, omissions, or neglect of the* contractor. . . ." *Id.* at 221.

No similar language appears in the contract documents between the MBTA, as owner, and Walter Reed, as contractor, or in the insurance certificate furnished by Walter Reed to the MBTA. See *Fireside Motors, Inc.* v. *Nissan Motors Corp. in U.S.A.*, 395 Mass. 366, 375 (1985). Contrast the indemnity clauses which appear in *Aho* v. *Blanchette*, 18 Mass. App. Ct. 149, 150 (1984), and *Speers* v. *H.P. Hood, Inc.*, 22 Mass. App. Ct. 598, 600 n. 4 (1986). Lacking any language of indemnity in the documents to construe, the MBTA asks that indemnity be implied from the circumstance that the contract documents required the contractor to buy general liability insurance. What is the point, the argument runs, of requiring the contractor to buy insurance if that insurance does not cover liability incurred by the owner? The answer is that the contractor's general liability insurance at least assures that, should both contractor and owner be negligent, the contractor will be able to meet its burden of any joint liability. Nothing in the *Shea* case or other authority of which we are aware stands for the remarkable proposition that requiring a contractor to carry general liability insurance imports an indemnity in favor of an owner against liability incurred by reason of the owner's negligence.

In a search for more suggestive language, the MBTA points to a clause in the construction contract under which the contractor agrees to accept the contract price as full compensation, including "all loss or damages arising out of the nature of the work. . . ." By any reasonable construction, that language refers to losses or damages which the contractor has sustained. Any doubt on that score would be resolved against the party who drafted the instrument, in this case the MBTA. See *Massachusetts Turnpike Authy.* v. *Perini Corp.*, 349 Mass. 448, 454 (1965).

---

[4]The issue of indemnity was resolved on a motion for summary judgment prior to trial by a judge other than the trial judge.

Occasions exist where a right to indemnification may be inferred from "unique special factors demonstrating that the parties intended that the putative indemnitor bear the ultimate liability," *Decker* v. *Black & Decker Mfg. Co.*, 389 Mass. 35, 38 (1983), or "when there is a generally recognized special relationship between the parties." *Araujo* v. *Woods Hole, Martha's Vineyard, Nantucket S.S. Authy.*, 693 F.2d 1, 2-3 (1st Cir. 1982). *Fireside Motors, Inc.* v. *Nissan Motors Corp.*, 395 Mass. at 375. See also *Oates* v. *Diamond Shamrock Corp.*, 23 Mass. App. Ct. 446, 447 (1987). Here there was a conventional owner-contractor relationship, devoid of "unique special factors" or elements of "generally recognized special relationship."

2. *Evidence of negligence.* Both the MBTA and Walter Reed timely moved for a directed verdict and for judgment notwithstanding the verdict. We examine the record for evidence from which a reasonable inference could be drawn in favor of the plaintiff, without weighing that evidence. *Forlano* v. *Hughes*, 393 Mass. 502, 504 (1984). *Roddy & McNulty Ins. Agency, Inc.* v. *A.A. Proctor & Co.*, 16 Mass. App. Ct. 525, 530 (1983). There was evidence that: the parking attendant booth had been bolted onto an asphalt island and that this was grievously deficient workmanship; it was like bolting the booth in sand; the original specifications had required the booth to be anchored on a concrete island; a change order from the MBTA had altered the position of the island but failed to specify that the relocated island should be of concrete; there was a "punch list" order to "re-bolt collector's booth" but it failed to specify how; the MBTA's construction inspector admitted responsibility for overseeing compliance with construction specifications, but he did not inspect the booth and certified the job as complete. That evidence of inadequate construction, inadequate specification, inadequate direction, and inadequate inspection was enough to take the case to the jury as to both the MBTA and Walter Reed.

3. *Exclusion of evidence of allegedly similar occurrence.* On the same day that Walter Reed had anchored the parking attendant's booth in asphalt, it had anchored a passenger shelter in concrete. The shelter blew over in a winter storm on January 9, 1978, some seventeen months before high winds swept the parking attendant's booth from its moorings. Evidence of the blowing over of the passenger shelter was excluded upon allowance of a motion in limine made by the plaintiffs. What Walter Reed sought to prove in offering evidence concerning the earlier event was that bolting a structure to concrete would not have helped in the face of extraordinary gusts of wind. The use of evidence of similar occurrences, however, is suspect and subject to rigorous standards for the laying of a foundation that the circumstances were, indeed, substantially identical. *Robitaille* v. *Netoco Community Theatre of N. Attleboro, Inc.*, 305 Mass. 265, 266-269 (1940). Here the structures were not the same in size, shape, or material. It appeared from the offer of proof, for example, that the passenger shelter did not topple over, but that the enclosing material parted from its pedestal. The pedestal, in turn, was bolted into concrete and did not part; the anchor bolts

remained securely in place — the opposite of what had occurred later in the case of the parking attendant's booth. Testimony concerning the earlier 1978 incident was rightly excluded.

4. *The "microburst" theory.* Robert Gilman, a meteorologist, was called as an expert by the contractor to testify about wind speeds at the time and place of the accident. During the course of his testimony Gilman moved from recorded wind speed data to discussion of "microbursts," severe down-bursts of wind which might occur when strong winds, blowing horizontally at different speeds and at different layers of the atmosphere, come into contact with thermally induced currents. Gilman was permitted to testify that he thought a microburst had occurred when the parking attendant's booth failed but was not allowed to answer a question as to what wind speeds might have been generated by the microburst.

By Gilman's own description, the microburst phenomenon was a "pro-posed theory" attributed to a Professor Fugita at the University of Chicago. There was no evidence of general acceptance of the theory of microbursts by the community of scientists involved. *Commonwealth* v. *Fatalo,* 346 Mass. 266, 269 (1963). *Frye* v. *United States,* 293 F. 1013, 1014 (D.C. Cir. 1923). See *Commonwealth* v. *Kater,* 388 Mass. 519, 525-535 (1983). The judge had broad discretion in deciding whether the expert had adequate information and preparation to render the particular opinion. *Louise Caroline Nursing Home, Inc.* v. *Dix Constr. Corp.,* 362 Mass. 306, 309 (1972). Rarely will an appellate court disturb the exercise of that discretion. *Keating* v. *Duxbury Housing Authy.,* 11 Mass. App. Ct. 934 (1981). No error attended exclusion of the hypothetical wind speed in a microburst, if that theoretical phenomenon had occurred at the time of the blow over.

5. *Jury instructions.* In his charge, the trial judge instructed the jury that the MBTA had a duty to provide Walter Reed with specifications which "complied with the standard of care required of persons in the profession of designing such plans and specifications." The MBTA objected that a public transportation agency ought not to be held to professional engineering standards. There had been testimony, however, that the MBTA had an in-house engineering design department, staffed with trained engineers, which routinely drew plans for structures to be built on MBTA property and, indeed, prepared the plans and specifications for this job. A duty voluntarily assumed must be performed with due care. *Mullins* v. *Pine Manor College,* 389 Mass. 47, 52 (1983). Restatement (Second) of Torts § 323 (1965). Nothing in G. L. c. 161A, § 21, excuses the MBTA from that duty.

6. *Plaintiffs' closing argument.* In his closing argument, counsel for the plaintiffs suggested that the MBTA's order to Walter Reed to "re-bolt collector's booth" must surely have meant, "Rip up the asphalt . . . put down some concrete. Take off the booth. Get the concrete to settle and harden . . . drill some bolt holes and bolt it in." The defendants urge that the explication of "re-bolt collectors' booth" was unwarranted inference and, hence, unfair argument. See *Bloom* v. *Town Taxi, Inc.,* 336 Mass.

78, 80 (1957); *Leone* v. *Doran*, 363 Mass. 1, 18 (1973). The defendants also protest an attempt by the plaintiffs' counsel to reconcile discrepancies in the evidence about Marie Croall's wages.

The points are insubstantial. Counsel did not make statements of facts not in the record; rather he engaged in development and rationalization of certain testimony which did appear in the record. Analogy, example, and hypothesis may be used within the considerable latitude extended to counsel in argument. See *Leone* v. *Doran*, *supra* at 18. See also *Commonwealth* v. *Ferreira*, 381 Mass. 306, 316-317 (1980). The motions for a mistrial based on improper argument were rightly denied. See *Davidson* v. *Davidson*, 19 Mass. App. Ct. 364, 378 (1985).

7. *New trial motion.* Denial of the motion for a new trial was free of error on the basis of familiar principles discussed in *Hartmann* v. *Boston Herald-Traveler Corp.*, 323 Mass. 56, 60 (1948), and *Oldham* v. *Nerolich*, 389 Mass. 1005, 1006 (1983).

The judgment of indemnity against Walter Reed is reversed. The judgments in favor of the plaintiff are to be amended so that they speak against the MBTA and Walter Reed jointly, thus providing an unmistakable basis for the operation of G. L. c. 231B.

*So ordered.*

*Stephen T. Keefe, Jr.,* for Walter Reed Corporation.
*Martin W. Cohen* for Massachusetts Bay Transportation Authority.
*Carol C. Kearns* (*Robert W. Langlois* with her) for the plaintiffs.