Fabricant, Judith, J.
INTRODUCTION
This action presents a dispute between an insurance agency and three of its former employees, who have formed their own agency. The former employer seeks to enforce restrictive covenants under a series of agreements; the former employees contend that the covenants are inapplicable on the undisputed facts, or unenforceable. Before the Court is the defendants’ motion for partial summary judgment. For the reasons that will be explained, the motion will be denied.
BACKGROUND
The record establishes the following facts as undisputed. MacDonald and Pangione Insurance Agency, Inc. (“M&P”), was founded by Robert H. Pangione and Francis J. MacDonald in about 1958. R.C. Briggs Insurance Agency, Inc., is a related entity under the same ownership. The three individual defendants named in this action, Paul MacDonald, Cindy Traverso, and Lauri Mancinelli, are the son of Francis MacDonald and the daughters of Robert Pangione. They began working for M&P, respectively, in 1987, 1981, and 1989. Paul MacDonald worked as a “producer,” selling insurance to customers; Traverso worked on marketing and relationships with carriers; and Mancinelli worked in customer service. All three became familiar with M&P’s competitive strategies, carriers and customers.
Each of the three defendants executed an employment agreement at the outset of his or her employment with M&P, in 1981, 1987, or 1989. Cindy Traverso’s agreement, in 1981, contained the following provisions pertinent here:[1]
The employee covenants with the Employer that on termination of her employment for any cause whatsoever, she shall be allowed to sell insurance in the Greater Lawrence Area . . . But, for the first five (5) years after leaving the Employer, the Employee promises that she will not accept, nor direct, or directly or indirectly solicit business from any of the Employer’s customers, whether the Employee serviced the customer or not.
*60 In consideration of this employment by the Employer, the Employee agrees that, on termination of her employment for any cause whatsoever, she will not for a period of five (5) years, direct [sic] or indirectly engage in the business of selling insurance or in competitive business within a radius of fifteen (15) miles from any of the Employer’s Insurance Offices, nor in any manner be connected with or employed by any person, firm or Corporation engaged in the insurance business.
Paul MacDonald’s agreement, in 1987, and Laurie Mancinelli’s agreement, in 1989, each included the latter of these two provisions, but not the former. Each of their agreements also stated, immediately before the non-competition provision, that “The employment of the Employee may be terminated by either party for any reason whatsoever by giving notice to the appropriate party.”
On June 12, 1991, the founders and then sole stockholders of P&M, Robert Pangione and Francis MacDonald, executed an Unqualified Employee Stock Option Plan (“UESOP”), in which they offered eligible employees stock options on specified terms. Under paragraph 2, the options were to be exercisable only “upon the retirement, disability or death of either or both of Francis J. McDonald or Robert H. Pangione,” and annually thereafter. The plan provided, at paragraph 5, that such options would be non-assignable, and “shall automatically lapse and expire upon the death or termination of full-time employment from the company of the eligible employee.” The plan further provided, at paragraph 9, that “if at any time after the purchase of shares of stock by an eligible employee, the eligible employee shall retire, die or otherwise leave the employment of the company, then the shares of stock then owned by said eligible employee must be sold back to the company at their then fair market value.” Paragraph 10 of the UESOP provided as follows:
A further condition of an eligible employee’s option to purchase hereunder shall be that the eligible employee shall, prior to the purchase of shares, execute a covenant not to compete with the Company. The covenant not to compete shall prohibit the eligible employee from competing with the company, or any subsidiary or affiliate thereof, for a period of ten (10) years, within a geographic radius of twenty (20) miles from any office of the company, a subsidiary or affiliate.
None of the defendants ever executed the covenant described in the 1991 UESOP, nor, as far as the record discloses, did any of them ever exercise any option to purchase stock under it.
The first of the founders to leave the company was Francis MacDonald, who retired from M&P in 1999. The issue of the company buying out his one-half interest arose. The company obtained an appraisal, which, according to the appraiser’s cover letter, was based on the assumption that the company had “no unusual exposures to loss of business,” such as “a producer’s leaving and taking a significant book of business.” The original employment agreements signed by the defendants, it appears, were missing, and Robert H. Pangione believed they had been stolen. Concerned about the possibility that employees would leave and take business with them, especially Paul MacDonald, who was the company’s largest producer, Pangione refused to go through with the buy-out of Francis MacDonald’s interest without the defendants and his son, Michael Pangione, signing covenants not to compete.
On April 11, 2000, Robert H. Pangione, the three individual defendants, and Michael Pangione, executed an “Agreement Concerning Obligations of Employee/Shareholders of MacDonald and Pangione Insurance Agency, Inc. and R.C. Briggs Insurance Agency, Inc. (“the 2000 Agreement”). The agreement recited that Francis MacDonald had retired, that Robert Pangione expected to do so, and that the employee signatories ’’are purchasing stock in the EMPLOYER under an agreement of even date, and have an expectation of obtaining by purchase or gift, additional stock in the company," and that the “buyout” of the two founders “is contingent upon the future successes and stability” of the company. The agreement went on to provide that each of the employee signatories would purchase stock under a referenced 1999 UESOP plan, and that all agreed to certain “mutual restrictive covenants.”[2] Concurrently with the execution of the 2000 Agreement, each of the individual defendants purchased 100 shares of stock in M&P, as well as 27 shares of stock in R.C. Briggs Insurance Agency, Inc.
The covenants set forth in the 2000 agreement included the following, in paragraph 2:
a. Not to divulge to any person ... the names of the employer’s customers or any other trade secrets he now has or that may be imparted to him, and that upon termination of an EMPLOYER/SHAREHOLDER’S employment, he shall deliver to the EMPLOYER immediately, all lists of customers, papers and files of any nature.
b. In consideration of the recitations and mutual promises expressed in this agreement, the EMPLOYEE/SHAREHOLDER agrees that upon termination of his employment or termination of his interest in the EMPLOYER for cause, he will not, for a period of five years, directly or indirectly engage in the business of selling insurance or in any other related competitive business to the EMPLOYER within a radius of fifteen (15) miles from any of the EMPLOYER'S insurance offices, nor in any manner, in the same geographic area and time period, directly or indirectly, be connected with or employed by any person, firm or corporation engaged *61 in the business of selling insurance that is in competition with EMPLOYER . . .
c. Each EMPLOYEE/SHAREHOLDER acknowledges that during his course of employment with the EMPLOYER he has developed unique and individual relationships with certain clients of the EMPLOYER and the EMPLOYER relies upon these clients for repeat and future business. In the event that an EMPLOYEE/SHAREHOLDER leaves the EMPLOYER he, or any other business entity he is affiliated with, will derive no income whatsoever from these former clients of the EMPLOYER. The EMPLOYEES/SHAREHOLDERS specifically and mutually agree to this because of the obligations of the remaining SHAREHOLDERS/EMPLOYEES to the founders of the business under the buyout agreements.
Additional sub-paragraphs of paragraph 2 recited the employees’ acknowledgment that “all of them have agreed to continue to be associated with the EMPLOYER,” and that “each party to the instant agreement has executed the same in consideration of each of the others agreeing to be bound by its terms,” and their further acknowledgment of their “fiduciary duties to the EMPLOYER and each other.”
Paragraph 4 of the agreement defined “[t]he term ‘cause’ in paragraph 2b,” setting forth five causes: “fail[ure] to perform his or her duties hereunder on account of illness or other incapacity” for more than twelve months, which would give the company the right “to terminate his employment,” “gross inattention to his or her duties for a substantial length of time,” conduct “which materially affects the business of the Employer,” failure “to devote his or her best efforts and his or her entire time to further the interest of the Employer,” and “[c]hronic alcohol or drug use” that materially impairs the employee’s effectiveness or the interests of the employer.
As of January 2007, the three individual defendants were, respectively, president, vice president, and chief financial officer of M&P. Robert H. Pangione had not retired. In January 2007, the three individual defendants formed MTM Insurance Agency, Inc. (“MTM”), and took steps in preparation for conducting business, including leasing space. All three left M&P, voluntarily, on January 31, 2007, and on February 1, 2007, they began conducting business as MTM. Using M&P’s customer information, they sent letters to customers, dated January 31, 2007, notifying them of their change of employment. As of the present Robert Pangione is President and 98 percent shareholder of M&P.
M&P filed this action, naming MTM and the three individuals, on February 22, 2007. The complaint asserts counts of breach of contract (counts I through IV), tortious interference with contractual relations (countV), misappropriation of trade secrets (count VI), conspiracy (count VII), fraud (count VIII), breach of fiduciary duty (count IX), violation of G.L.c. 93A (count X), and conversion (count XI). On February 27, 2007, the Court issued a preliminary injunction barring the defendants from soliciting customers of M&P, using or disclosing its materials or information, and destroying evidence. The present motion addresses only the contract claims, counts I through IV. Defendants seek summary judgment on those claims, and also seek relief from the preliminary injunction.
DISCUSSION
Defendants’ argument follows four steps: (1) The original employment agreements were superseded and are of no further effect; (2) the restrictions in the 1991 UESOP plan are of no effect, because the defendants never signed them or bought stock under the plan; (3) paragraph 2(b) of the 2000 Agreement applies only in the event of termination for cause, which did not occur; and (4) paragraph 2(c) of the 2000 agreement is so over-broad as to be entirely unenforceable as in violation of public policy. The Court agrees with the first three steps of the argument. As to the fourth, the Court agrees that the provision is over-broad, but not that that prevents any enforcement; the Court will instead narrow the restriction to a reasonable scope.
The undisputed facts establish that the purpose of the 2000 Agreement was to replace the original employment agreements, which were missing, and which Robert Pangione believed had had been stolen. The parties negotiated the 2000 Agreement with the understanding that it, not the missing earlier agreements, would govern their relationship. The 2000 Agreement therefore superseded the original employment agreements, and those earlier agreements are of no further force or effect. See Roddy & McNulty Ins. Agency, Inc. v. A.A. Proctor & Co., 16 Mass.App.Ct. 525, 536 (1983). As to the 1991 UESOP plan, the undisputed facts establish that these defendants neither signed it nor purchased stock under it.[3] It follows that the 2000 Agreement is the governing document.
That agreement addresses separation of the employee/shareholders in paragraphs 2(b) and (c). These provisions, by their plain terms, provide for separation under different circumstances. Paragraph 2(b) addresses instances of “termination of his employment or termination of his interest in the EMPLOYER for cause,” while paragraph 2(c) addresses “the event that an EMPLOYEE/SHAREHOLDER leaves the EMPLOYER.” Despite the separate treatment of these different events in the two sub-paragraphs, plaintiff argues that the restrictions of both paragraphs apply to voluntary separation. Its theory, based on the disjunctive “or” in the quoted phrase from 2(b), is that the “for cause” limitation applies only to termination of the employee-shareholder’s interest — that is, divestiture of the employee’s stock — and not to termination of employment. On that basis, the plaintiff contends that the restrictions of 2(b) apply to all terminations of employment, voluntary or not.
*62 The most obvious problem with the plaintiffs reading is that it ignores paragraph 4, which defines cause for purposes of paragraph 2(b). The causes set out in paragraph 4 all involve deficiencies in the performance of duties of employment. Indeed, the first cause listed, at paragraph 4(a), refers expressly to termination and resumption of employment. There is simply no room for doubt that “for cause” in paragraph 2(b) refers to cause for termination of employment.[4] If follows that the restriction stated in 2(b), barring competition for five years within fifteen miles, does not apply to these defendants, who left their employment voluntarily.
The restriction that does apply to them is that set out in paragraph 2(c), which by its terms governs voluntary separations, and is limited to deriving income from former clients.
This reading, in addition to conforming to the actual text of the agreement, gives effect to all its provisions, in accord with its overall purpose. An employee whose conduct gives cause for termination suffers the consequence of being barred from the industry in the geographic area for five years. An employee who commits no misconduct, but who chooses to leave, is free to compete in the industry by seeking out new customers, but is not permitted to take those of the employer’s customers with whom the employee developed relationships while employed. This reading protects the employer’s good will, addressing the concern that gave rise to the agreement, but preserves the employee’s freedom to practice his or her trade and to earn a living. See generally, Alexander & Alexander, Inc. v. Danahy, 21 Mass.App.Ct. 488, 497 (1986) (discussing importance of good will in insurance industry).
The question that remains is the scope of the restriction under paragraph 2(c), and the extent to which it is enforceable. Defendants point out that it expresses no limitations of time or geography, and indeed no limitation as to the nature of the business from which income might be derived; the provision could thus be read to bar deriving income from former clients for services entirely unrelated to the insurance business. The provision also, as defendants read it, could encompass all former clients of M&P, as opposed to just those these defendants served. Read so broadly, defendants argue, the provision goes far beyond what may be necessary to protect legitimate business interests of the employer, and is unenforceable as contrary to public policy. See All Stainless, Inc. v. Colby, 364 Mass. 773, 778 (1974). Plaintiff responds that the provision should be read in conjunction with the previous paragraph, which states a time and geographic limitation of five years and fifteen miles.
In the Court’s view, certain limitations are implicit in the provision itself, or in the context of the agreement. The provision refers to the “unique and individual relationships" the employee has developed with “certain clients,” and the employer’s reliance on “these clients” for repeat and future business. On that basis, it prohibits the employee from deriving income from “these former clients.” The Court thus reads the provision as limited to former clients whom the employee served while employed with M&P. Also implicit, in the overall context if not the language of the agreement, is that the restriction is limited to income derived from services in the insurance business; no legitimate purpose would be served by a restriction extending to other types of services.
The provision on its face contains no limit of time or geography. Where the restriction is limited to former clients, geography is of no real relevance; the interest to be protected is the good will of these particular clients, wherever they might be. Time, however, is significant. At some point, the good will formed during the employee’s employment will have dissipated, and the client’s willingness to remain with the employer will depend on the extent to which the client remains satisfied with the employer’s services. At that point, no legitimate purpose would be served by further enforcement of the restriction.
The defendants argue that that time has already passed, since they have been under injunction for more than a year. The Court is not persuaded. Insurance renewals tend to occur annually. Thus, a one-year period is only one renewal cycle. If defendants were permitted to deal with their former clients now, the likelihood is high that they would be trading on the good will they accumulated with these clients while in the plaintiffs employ, which rightfully belongs to the plaintiff.
The plaintiff urges the Court to adopt the five-year limitation expressed in 2(b). The Court sees nothing in the language of the document to suggest that the parties intended that time limit to apply to 2(c). Nevertheless, it does appear that the parties have identified five years as a period of time sufficient to provide adequate protection to the plaintiff, without undue burden on the defendants. Five-year restrictions have some precedent in the insurance industry. See Alexander & Alexander, Inc. v. Danahy, 21 Mass.App.Ct. at 491, 498. Although that case involved the sale of a business, which this does not, the defendants in this case did not suffer from the sort of unequal bargaining power that applies to employees in many cases; these defendants are the children of the principals in the company, with expectations of inheritance, and held executive titles and responsibilities. The Court concludes, therefore, that the restriction contained in paragraph 2(c) is enforceable, provided that it is limited to former clients served by these defendants, for a period of five years, and income derived from services in the insurance business. The breach of contract counts against the individual defendants, counts I, II, and III, are viable based on paragraph 2(c) of the 2000 Agreement,[5] and the motion for summary judgment must be denied as to those counts.
*63 Defendant MTM argues that it is entitled to summary judgment on Count IV, because it is not a party to any of the agreements. The plaintiff responds that a non-party to an agreement, who is aware of the agreement, can be enjoined from violating it. See Alexander & Alexander, Inc., 21 Mass.App.Ct. at 499-501. In that case the Court approved an injunction against the former employee’s new employer, for the purpose of effectuating enforcement of the former employee’s contractual obligation. Similar relief may be warranted here, where MTM was created by the individual defendants for the purpose of operating a business in competition with the plaintiff. The Court cannot make that determination at this stage, based on the record presented. Accordingly, the motion for summary judgment will be denied as to Count IV.
CONCLUSION AND ORDER
For the reasons stated, the Defendant’s Motion for Partial Summary Judgment is DENIED. The contract claims, counts I through IV, will remain for trial, subject to the limitations set forth herein. The defendants’ request to vacate the preliminary injunction is also DENIED. The case will be scheduled for final pretrial conference at the earliest available date.

 She was then Cindy Pangione.

 The record does not include the “agreement of even date" or the 1999 UESOP plan.

 The plaintiff asserts that they did, but the documentary evidence submitted indicates the contraiy. The 2000 agreement recites that the individual defendants are purchasing stock “under an agreement of even date” and pursuant to a UESOP plan dated March 2, 1999, incorporated by reference into the 2000 Agreement.

 A second problem with plaintiffs reading is that it assumes the existence of circumstances in which an employee-shareholder might be divested involuntarily of ownership interest, but not of employment. Counsel has not identified any such circumstances, and none come to mind. As noted supra, the record before the Court does not include the 1999 UESOP plan or the “agreement of even date.” The 1991 plan provided that the stock options issued under it “shall automatically lapse and expire upon the death or termination of full-time employment from the company of the eligible employee,” and that “if at any time after the purchase of shares of stock by an eligible employee, the eligible employee shall retire, die or otherwise leave the employment of the company, then the shares of stock then owned by said eligible employee must be sold back to the company at their then fair market value.” If the 1999 plan contains similar terms, termination of employment would automatically trigger termination of ownership interest.

 Plaintiff contends that these counts are based also on paragraph 2(a). Defendants contend that the facts do not support a breach of that provision, but the factual materials before the Court do not provide a basis to evaluate that contention. The issue remains for trial.