[NOT FOR PUBLICATION--NOT TO BE CITED AS PRECEDENT]
United States Court of Appeals
For the First Circuit

No. 97-2241

BEAL BANK S.S.B. F/K/A BEAL BANC S.A.,

Plaintiff, Appellant,

v.

RICHARD H. KROCK,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Edward F. Harrington, U.S. District Judge]

Before

Lynch, Circuit Judge,

Campbell and Bownes, Senior Circuit Judges.

David D. Pavek, with whom James R. Everson, Messner, Pavek &
Reeves, LLC., William V. Sopp, John F. Tocci, and Finnegan, Hickey,
Dinsmoor & Johnson, P.C., were on brief for appellant.
Alan M. Spiro, with whom Edwards & Angell were on brief for
appellee.

September 3, 1998

BOWNES, Senior Circuit Judge. In this debt collection
case, the plaintiff, Beal Bank S.S.B. ("Beal Bank"), seeks to
collect on a note that was part of a written settlement agreement
containing a clause that precluded oral modifications. The debtor,
Richard H. Krock, interposes what he claims was a subsequent oral
modification of the contract. The district court, after trial,
found that the oral modification was in fact agreed upon and was an
enforceable contract under Massachusetts law. The court concluded
therefore that the debtor was not liable to the bank. Holding that
the district court's findings of fact were not clearly erroneous,
and applying the law of Massachusetts in this diversity action, we
affirm the court's conclusion that the oral modification was
enforceable. We remand nevertheless for recalculation of the
amount owed.
Facts
In 1991, Pier 37 Associates Limited Partnership ("Pier
37") executed a promissory note in the amount of $3.6 million to
First Mutual Bank for Savings. This note was secured in part by a
mortgage on a marina located in Falmouth, Massachusetts. In
addition, defendant Richard H. Krock, who was a general partner of
Pier 37, gave a personal guarantee of the note, limited to
$1,600,000.
When First Mutual Bank became insolvent, the Federal
Deposit Insurance Corporation ("FDIC") took over its assets. The
FDIC sued Pier 37, Krock, and others, to collect on the note. 
While the case was pending, the FDIC assigned its interest in the
note to BSB Mortgage, Inc. ("BSB"), an affiliate of Beal Bank, for
approximately $1,000,000. In turn, BSB assigned its interest to
Beal Bank. 
In 1993, Beal Bank foreclosed on the property. The
parties to the litigation, after substantial negotiations, entered
into a settlement agreement whereby Krock paid Beal Bank $150,000
in cash and executed a $350,000 promissory note, payable over ten
years in annual installments. The agreement contained a clause
stating that it was complete and integrated, and that no subsequent
modifications could be made to the agreement except in writing.
Krock testified that he negotiated an oral side agreement
in which Beal Bank would, if the property sold for over $900,000,
reduce Krock's debt by two-thirds of the amount by which the sale
price exceeded $900,000. Krock first discussed this side agreement
with Will Balthrope, then a vice president of Beal Bank, prior to
the execution of the settlement agreement. Krock testified that
Balthrope once again agreed to the offset plan after execution but
before Beal Bank sold the marina in 1995 for $1,505,000. The
excess of the sale price over $900,000 was $605,000, so, under
Krock's interpretation of the side agreement, his obligation would
be reduced by two-thirds of that, or $403,333. Because this
reduction exceeds the face amount of Krock's note to Beal Bank,
Krock asserts he owes Beal Bank nothing.
The district court, after a bench trial, ruled that the
side agreement did exist, implicitly found it valid under
Massachusetts law, and applied the agreement to reduce Krock's debt
to zero. The court's decision turned on its finding that Krock was
entirely credible in his testimony regarding the side agreement. 
The court also noted that Balthrope, who was the only other person
besides Krock with personal knowledge of whether or not there was
a subsequent oral modification, and who therefore could have
supported the Bank's position that Krock's oral agreement claim was
untrue, was inexplicably not called to the stand nor was his
testimony preserved, although he had been a bank employee up until
two months before trial. Beal Bank appealed the district court's
decision.
Discussion
Two issues control the outcome of this case. One is
factual: was there a side agreement made between Krock and
Balthrope, and was it made after the execution of the written
settlement agreement? The unrebutted testimony of Krock, accepted
as credible by the district court, plays a major role in answering
this question. The second issue is legal: even if Krock's
testimony is taken as 100% true as to the existence and timing of
the side agreement, would such an oral side agreement be
enforceable under Massachusetts law to modify the terms of the
written and completely integrated settlement agreement? We begin
our analysis with the pertinent Massachusetts law.
We have previously summarized the relevant aspects of
Massachusetts contract law as follows:
Evidence of prior or contemporaneous oral
agreements cannot be admitted to vary or
modify the terms of an unambiguous written
contract. New England Fin. Resources, Inc. v.
Coulouras, 566 N.E.2d 1136, 1139 (Mass. App.
Ct. 1991) (parol evidence rule precludes use
of oral evidence to modify integrated
agreement); Aerostatic Eng'g Corp. v.
Szczawinski, 294 N.E.2d 521, 522 (Mass. App.
Ct. 1973) (oral agreement cannot modify
payment terms unambiguously expressed in
written contract). Instead, "parties are
bound by the plain terms of their contract."
Hiller v. Submarine Signal Co., 91 N.E.2d 667,
669 (1950) (restrictive agreement between
industrial park developer and park tenant
interpreted according to meaning of
unambiguous written agreement).

Fairfield 274-278 Clarendon Trust v. Dwek, 970 F.2d 990, 993-94
(1st Cir. 1992).
Thus, if Krock's side agreement with Balthrope was made
before the execution of the written settlement agreement, then the
written agreement supersedes it and the side agreement is barred by
the parol evidence rule. See id. 
In the present case, Beal Bank devoted a great deal of
its opening brief to its assertion that the parol evidence rule
bars testimony about an oral modification made prior to the
execution of the settlement agreement. Yet at trial the district
court sustained each and every objection that was properly made
under the parol evidence rule. Krock's brief pointed this out, and
made clear that Krock was not relying on the pre-execution
negotiations to modify the written instrument. Rather, he rested
his defense on the contention that he and Balthrope agreed to a
subsequent modification of the settlement agreement.
Under Massachusetts law, if a subsequent agreement is
made, after the execution of a written contract, it may be
enforceable. See New England Factors v. Genstil, 76 N.E.2d 151,
154 (Mass. 1947) (holding that the parol evidence rule does not
apply "where the terms of a written agreement have been modified by
subsequent oral agreement"). As a leading authority has put it:
Because the parol evidence rule applies only
to precontractual negotiations, it does not
bar evidence of subsequent negotiations to
show modification of the contract. Even a
completely integrated agreement can therefore
be modified or rescinded orally.

E. Allan Farnsworth, Contracts 7.6 (2d ed. 1990). Thus, "[t]he
parol evidence rule has no application to the situation . . . where
it could be found that a new oral contract was entered into between
the parties which superseded the original contract." L.W.
Severance & Sons, Inc. v. Angley, 125 N.E.2d 415, 420 (Mass. 1955).
Even a fully integrated contract i.e., a written contract
containing a clause stating that subsequent modifications must be
in writing may, under appropriate circumstances and with
appropriate proof, be modified by a subsequent oral agreement. SeeCambridgeport Sav. Bank v. Boersner, 597 N.E.2d 1017, 1022 (Mass.
1992) ("[A] provision that an agreement may not be amended orally
but only by a written instrument does not necessarily bar oral
modification of the contract."); cf. Farnsworth, supra, 7.6 ("Can
the parties, by inserting a no-oral-modification clause,
effectively permit only written modifications? The common-law
answer has been that they cannot."); Wagner v. Graziano Const. Co.,
136 A.2d 82, 83 (Pa. 1957) ("The most ironclad written contract can
always be cut into by the acetylene torch of parol modification
supported by adequate proof. . . . The hand that pens a writing
may not gag the mouths of the assenting parties."). 
Massachusetts does, however, impose a heavy burden on the
party seeking to modify an integrated written contract by a
subsequent oral agreement: "The evidence of a subsequent oral
modification must be of sufficient force to overcome the
presumption that the integrated and complete agreement, which
requires written consent to modification, expresses the intent of
the parties," at least as of that time, that the written agreement
rather than any alleged subsequent oral modification should govern. 
Boersner, 597 N.E.2d at 1022 n.10. Whether the intent of the
parties has changed is, of course, a question of fact to be
determined by the trier of fact.
Krock testified that he had a conversation with Balthrope
after execution of the written agreement, and that Balthrope stated
a new commitment to reduce Krock's debt obligation by two-thirds of
any amount by which the sale price of the Pier 37 property exceeded
$900,000.
The district court found Krock's testimony to be
credible:
[T]he sole disputed factual issue pending
before the Court is the credibility of the
witness Defendant Krock regarding the
existence of the Side Agreement. I believe
his testimony, as it was forthright and
consistent and his demeanor while under
intense cross-examination displayed the
attitude of an individual who was telling the
truth with conviction.

Not only did the district court find Krock's testimony
wholly believable, but it was essentially unrebutted. In contrast
with Krock's testimony as to the existence of the side agreement,
the court noted that 
the only other witness to the Side Agreement
was Mr. Balthrope who was not called to
testify on behalf of [Beal Bank]. Although
Mr. Balthrope was listed as a prospective
witness by the [Bank] in its pretrial filings
and left the employment of the bank only in
July [approximately two months before the
trial], for some inexplicable reason, he was
not called to the stand nor was his testimony
preserved by way of deposition. Therefore,
the credible testimony of the Defendant Krock
stands unrebutted and I accept it.

The court was entitled to draw an adverse inference
against Beal Bank because of the absence of any testimony from
Balthrope. Balthrope was the only person, other than Krock, who
had personal knowledge as to whether there was indeed a subsequent
side agreement, and what such an agreement may have included. 
Moreover, for years prior to the trial, up until two months before
trial, Balthrope was an employee of the Bank and under its control. 
Even Balthrope's termination, pursuant to a layoff, was within the
Bank's control. The bank had included Balthrope on its witness
list up until the Friday before trial began. Yet the Bank failed
to present Balthrope's testimony to the court (through subpoena or
otherwise) and failed to preserve his testimony through deposition. 
In light of all these circumstances surrounding the Bank's "missing
witness," the court was entitled to draw an adverse inference
against the Bank that Balthrope was not produced because his
testimony would have been damaging, i.e., it would not have
contradicted Krock's on the question of the subsequent oral
modification. See, e.g., Bath Iron Works Corp. v. United States,
34 Fed. Cl. 218, 340-41 (1995), aff'd, 98 F.3d 1357 (Fed. Cir.
1996). Nor did the bank attempt to rebut this inference by
providing a legitimate explanation for its failure, such as might
be the case if the witness had suddenly and unexpectedly died. 
The Bank did produce one witness in an effort to
contradict Krock's testimony regarding the subsequent side
agreement: Steven D. Harper, a commercial loan officer at the bank
for one year, who had taken over the Krock file from Balthrope. 
The district court considered Harper's demeanor under direct- and
cross-examination, re-direct, re-cross, re-re-direct, and re-re-
cross, and declined to rely on Harper's evidence to undercut
Krock's testimony. Harper's initial testimony was that he had had
conversations with Balthrope "regarding the documentation on the
Krock promissory note." Harper had asked Balthrope whether there
were any documents in the bank's files that would bear upon Krock's
allegation that there was a subsequent side agreement. Balthrope
had told Harper that there were no such documents and that he "did
not know of any agreement as such." Harper's original testimony
did not mention any discussion with Balthrope other than about
written documentation. There was nothing one way or the other
about a possible oral modification, in Harper's direct, cross, re-
direct, or re-cross examinations. The only testimony by Harper on
oral modification was on re-re-direct. The district court was
entitled to discount Harper's testimony on re-re-direct, based
upon lack of credibility, regarding anything Balthrope told him
other than about the existence or absence of documents in the
files. We find no clear error in the district court's decision to
accept Krock's "unrebutted" testimony.
In addition to the unrebutted credible testimony of
Krock, the court, in determining intent, was entitled to consider
the conduct of the parties. "Mutual agreement on modification of
the requirement of a writing may . . . be inferred from the conduct
of the parties and from the attendant circumstances of the
[particular] case." Boersner, 597 N.E.2d at 1022 (internal
quotation marks omitted); see Schinkel v. Maxi-Holding, Inc., 565
N.E.2d 1219, 1223 (Mass. App. Ct.), rev. denied, 409 Mass. 1104
(1991). Here, the parties acted in a way that was consistent with
Krock's testimony that there was a subsequent oral modification. 
When Krock's first payment was due under the settlement
agreement, on November 1, 1994, he had no funds and did not pay it. 
The property had not yet been sold by the Bank; the sale did not
take place until June 1, 1995. Yet the Bank took no action against
Krock in November 1994 nor in early 1995; indeed, it did not file
suit against Krock until December 1995, more than six months after
the sale of the Pier 37 property. Krock testified as to a
conversation he had with Balthrope after his default but before the
sale. According to Krock's unrebutted testimony, Balthrope told
him the Bank "wouldn't do anything, he [Balthrope] wouldn't do
anything until such time as the sale took place and . . . the
reduction, if any, in the note could be quantified, and then the
whole thing would be restructured based upon the reduced amount of
the note and the reduced payment." Consistent with this
conversation, Krock waited until the sale took place; he did not
pay any part of his $40,000 payment that was due on November 1,
1994, nor in early 1995. Likewise, the Bank took no action against
him prior to its June 1, 1995 sale of the property.
After the sale but before suit was filed against him,
Krock had another conversation with Balthrope. Krock told
Balthrope that, in light of the high price received for the
property, their oral agreement should wipe out his debt on the
note. Krock testified that Balthrope did not dispute the validity
of the subsequent oral modification or Krock's interpretation of
it; instead, he responded by saying "they're not going to pursue it
anyway because the financials show that there is no ability to
pay." Although the Bank eventually did pursue Krock by filing
suit in December 1995, the Bank's actions (or non-action) prior to
that time is consistent with Krock's version of events. 
We conclude that the district court's acceptance of
Krock's version of events was not clearly erroneous, even applying
the requirement under Massachusetts law that Krock has to meet a
heavier burden of proof in order for an oral modification to be
effective against a written contract. As part of that heavier
burden, Massachusetts courts typically require "'ample evidence,'"
demonstrating that "the party denying the existence of a
modification had . . . 'unequivocally' expressed [its] approval 'of
the many pertinent details' of the new agreement." Boersner, 597
N.E.2d at 1022 (quoting First Pa. Mortgage Trust v. Dorchester Sav.
Bank, 481 N.E.2d 1132, 1139 (Mass. 1985)). We think the above-
described evidence is "ample," and the only "pertinent detail[]" of
the new agreement was the offset by two-thirds of the sale price's
excess over $900,000. According to Krock's credible testimony,
Balthrope agreed to this detail "unequivocally."
We hold therefore that the district court did not clearly
err in concluding that Krock's version of events was credible, nor
did it err in its legal conclusion that the subsequent modification
that Krock described is enforceable. We turn briefly to the Bank's
other arguments on appeal.
The Bank contends that the alleged subsequent
modification agreement fails because no consideration was given by
Krock in exchange for the Bank's willingness to modify the amount
of Krock's debt based on the sale price of the Pier 37 property. 
The Bank acknowledges that, "under appropriate proof, an oral
modification may be found," but if so, "the new contract created by
the subsequent modification must be supported by consideration." 
Bank Br. at 15 (citing Siegel v. Knott, 55 N.E.2d 889, 890 (Mass.
1944) ("The mode of performance required by a written contract may
be varied by a subsequent oral agreement based upon a valid
consideration.")). The Bank points out that Krock did not take any
"action in reliance on the alleged reaffirmation of the prior
agreement other than to continue to fail to make the payments he
agreed to make under the Note." Id. The Bank also relies heavily
on 3 Richard A. Lord, Williston on Contracts 1826 (4th ed. 1992),
as quoted in De Blois v. Boylston & Tremont Corp., 183 N.E. 823,
827 (Mass. 1933):
[A] subsequent contract completely covering
the same subject-matter and made by the same
parties as an earlier agreement, but
containing terms inconsistent with the former
contract, so that the two cannot stand
together, rescinds, substitutes and is
substituted for the earlier contract and
becomes the only agreement of the parties on
the subject. But the subsequent agreement
must have sufficient consideration. Therefore
if the undertaking by one party is simply to
perform the whole or part of what he promised
in the original contract, it will not support
a promise by the other party to perform what
he previously agreed and something more.

The Bank asserts that this is still good law in Massachusetts.
As Krock points out, however, the Bank never made this
consideration argument below. Although Krock stated in his
opposition to the Bank's motion in limine that consideration is not
required for an oral modification to be effective against a written
contract under Massachusetts law, the Bank did not respond in its
pretrial motion papers, conferences, or at trial. Moreover, after
the district court ruled against it, the Bank failed to file any
motion for a new trial or to alter or amend judgment within the
ten-day period set forth in Rule 59 of the Federal Rules of Civil
Procedure Rule. And in the motion for reconsideration that the
Bank filed on the twentieth day, the Bank again failed to mention
lack of consideration as a defect in Krock's case.
As we have said on numerous occasions, we will not
consider on appeal issues that could have been, but were not,
raised in the trial court. See Sullivan v. National Football
League, 34 F.3d 1091, 1097 n.1 (1st Cir. 1994); Desjardins v. Van
Buren Community Hosp., 969 F.2d 1280, 1282 (1st Cir. 1992). "An
appeal is not an opportunity to conjure new arguments not raised
before the district court." Brown v. Hot, Sexy and Safer
Productions, Inc., 68 F.3d 525, 530 (1st Cir. 1995); see NASCO,
Inc. v. Public Storage, Inc., 29 F.3d 28, 31 n.4 (1st Cir. 1994)
(holding that theory not presented to district court and raised for
the first time on appeal is deemed waived). In particular, having
failed to object below (or to raise the issue at all), it is too
late for the Bank to object that there was no evidence on which the
court could find consideration to support the contract
modification. See Johnston v. Holiday Inns, Inc., 565 F.2d 790,
795 n.6 (1st Cir. 1977). The argument has been waived. See Howellv. FDIC, 986 F.2d 569, 572 (1st Cir. 1993).
Even if we were to reach the merits of the Bank's
consideration argument, it would not change our result. The
doctrine of consideration does not necessarily bar enforcement of
a subsequent oral contract modification. "Modifications . . . have
long been recognized in law as valid, without additional
consideration, even when based on oral agreements modifying
executory written contracts." Roddy & McNulty Ins. Agency, Inc. v.
A.A. Proctor & Co., 452 N.E.2d 308, 314 (Mass. App. Ct.), rev.
denied, 454 N.E.2d 1276 (1983). "The contract, when modified by
the subsequent oral agreement, is substituted for the contract as
originally made, and the original consideration attaches to and
supports the modified contract." Thomas v. Barnes, 31 N.E. 683,
684 (Mass. 1892).
It remains, of course, a factual question whether a party
intends to relinquish her contractual rights by entering into a
subsequent agreement. See Roddy & McNulty, 452 N.E.2d at 314. In
the instant case, as discussed supra, the district court assessed
the evidence, in particular, Krock's credibility in recounting his
description of events, the lack of credibility and of personal
knowledge on the part of the Bank's witness, Harper, and the
unexplained absence of the Bank's former vice president, Balthrope,
who was the only person besides Krock who was privy to the actual
conversations in dispute. On the basis of its assessment of the
evidence, the district court determined that a subsequent
modification was indeed agreed upon by the parties and was
enforceable. The court's decision was not clearly erroneous.
Beal Bank's final argument is that, even if the district
court was correct that the subsequent oral modification was
enforceable as testified to by Krock, the court erred in applying
that modified agreement. The district court calculated the amount
by which the sale price of the Pier 37 property ($1,505,000)
exceeded $900,000, i.e., $605,000, and multiplied it by two-thirds,
for an offset of $403,333. The court then applied this offset to
the principal amount of Krock's obligation to the bank, $350,000. 
The court therefore determined that the offset totally extinguished
Krock's debt. Beal Bank argues that the $403,333 reduction should
instead be applied against the gross amount of the obligation 
including accrued interest, late charges, and legal fees 
calculated as of the time of trial. So calculated, Krock would
still owe the bank over $100,000. 
Krock points out that Beal Bank failed to raise this
offset argument at the district court level, including in its
motion for reconsideration, where it made an entirely different
argument. Krock argues that the Bank has therefore waived its
offset argument; it cannot be raised for the first time on appeal. 
See Brown, 68 F.3d at 530.
But prior to receiving Judge Harrington's ruling, Beal
Bank did not know what offset terms he would hold were contained in
the oral modification. (The Bank did not even know whether Judge
Harrington would find that the parties had agreed to an oral
modification.) Thus the Bank could not have raised its offset
argument below, except through a post-trial motion, and such a
motion is not a prerequisite for perfecting its appeal of the
district court's judgment. We turn therefore to the merits of the
Bank's calculation argument.
We agree with Krock that the Bank's argument does not
make sense as to how to apply the offset. We have found that the
district court properly accepted Krock's testimony as to the nature
and terms of the side agreement. Thus, the proper calculation
under the side agreement would apply two-thirds of the amount by
which the sale price exceeded $900,000 against Krock's debt at the
time the property was sold. If this had been done at that time,
Krock's debt would have been substantially reduced; there would be
no basis for the Bank to have continued charging him interest and
collection charges against the extinguished portion of the debt. 
Much of the debt as calculated by the Bank would have been erased. 
Therefore, we reject the Bank's position that interest and late
charges should have continued to accrue on Krock's entire debt
through the time of trial, before applying the orally agreed-upon
offset. 
But we also think Krock's contention that the offset
entirely canceled his obligation is exaggerated. Krock argues on
appeal that the premium should be applied against the $350,000 face
amount of the note. His testimony at trial was simply that it
would be applied against "my debt." The words "my debt" would
seem, on their face, to include both the principal on the note and
any interest that had accrued up until the time the offset kicked
in. When the Pier 37 property was sold, on or about June 1, 1995,
there was at least some interest that had accrued since the date of
the note in November 1993. Krock points out that, as of
November 8, 1995, the Bank was claiming that his debt was
$449,010.86. Thus, as of June 1, more than five months earlier,
Krock's debt would have been somewhat less than that amount,
including both principal and interest, but clearly more than the
$350,000 face amount of the note that the district court used. It
appears that the total debt would have been more than the
$403,333.33 offset that should have been applied against it,
leaving some smaller amount still due. And the Bank would now be
entitled to interest that has subsequently accrued on that smaller
amount, between the June 1, 1995 date of offset and the present. 
We do not, however, think it fair for the Bank to charge
Krock for its attorneys' fees for this litigation, because it is
not at all clear that any litigation would have been necessary if
the Bank had simply sought to collect the smaller amount that we
now hold it was due as of June 1, 1995, as opposed to denying the
offset and seeking to collect the much larger amount that it
claimed in this action (including an additional three years' worth
of interest on $403,333). 
We therefore remand for a calculation of the proper
amount owed, accepting Krock's testimony as to what exactly was
contained in the subsequently agreed-upon modification of the
original contract. That is, the court should apply the offset as
of the date of sale of the Pier 37 property, and apply it to
Krock's accumulated total debt as of that date. The district court
should then calculate the interest that would have accrued on that
reduced amount of debt, from that offset date through the present.
Affirmed as to the existence of the oral modification and
as to its terms; remanded for calculation of the amount owed under
the modified contract.